873 A.2d 1171

**Jason Harry GORGE**

v.

**STATE of Maryland.**

**No. 54, Sept. Term, 2004.**

Court of Appeals of Maryland.

May 10, 2005.

602

Sherrie B. Glasser, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), for petitioner/cross-respondent.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for respondent/cross-petitioner.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, J.

We are asked to determine whether a sentence of life without the possibility of parole may be imposed if the record does not reflect that the State gave timely written notice to the defendant of the State's intent to seek that sentence. Further, we are asked to decide if Mr. Gorge made voluntary statements to the police while hospitalized and recovering from serious self-inflicted wounds. On November 12–14, 2002, Jason Harry Gorge was tried by a jury in the Circuit Court for Baltimore County and convicted of one count of first-

degree felony-murder, one count of premeditated murder, and one count of robbery. On March 3, 2003, Mr. Gorge was sentenced to life without the possibility of parole for the first-degree murder conviction and to fifteen years for the robbery. Mr. Gorge appealed and the Court of Special Appeals affirmed the circuit court judgment. On August 25, 2004, we granted *certiorari*. *Gorge v. State*, 382 Md. 687, 856 A.2d 723 (2004).

We hold that the court may not impose a sentence of life without the possibility of parole unless the record satisfactorily reveals that the statutory conditions were satisfied, including giving written notice to the defendant at least 30 days before the trial. We also hold that Mr. Gorge's statements to the police were voluntarily made.

## FACTS

In October, 2001, Mr. Gorge and his girlfriend, Dorothy Brooks ("Dorry" or "Ms. Brooks"), were living in his car. Both were addicted to heroin and cocaine. On October 27, 2001, Mr. Gorge and Ms. Brooks overdosed, attempting to commit suicide. Their attempts failed and on the following morning, they both awoke extremely "drug sick," in the words of Ms. Brooks. According to Ms. Brooks, Mr. Gorge told her he was going to go to his mother's house to ask for money so they could "get well." Ms. Brooks explained that getting well meant getting more drugs so that they would not continue to feel the pain of drug sickness. Ms. Brooks testified that she fell asleep and when she woke up, Mr. Gorge was back with a van. She got in the van with Mr. Gorge and they drove to the east side of Baltimore to purchase drugs. Ms. Brooks testified that Mr. Gorge told her that he borrowed the van from his grandfather. Eventually, they drove to a hotel in Pennsylvania and consumed more drugs. Ms. Brooks testified that while they were at the hotel, Mr. Gorge confessed to her that he hit his grandfather over the head, punched him, and strangled him. Ms. Brooks also testified that after Mr. Gorge confessed to her, he took an overdose of sleeping pills.

Ms. Brooks fled and called her mother and asked some people she saw to call the police. Mr. Gorge came after her, but eventually returned to the hotel room, where he attempted to kill himself by cutting his throat and wrists and by stabbing himself seventeen times. The police apprehended him on October 30, 2001, and took him to a hospital in Pennsylvania for emergency surgery.

On October 31, 2001, police officers in Baltimore found the body of Mr. Gorge's grandfather, Harry Gorge, Jr., at his home. The medical examiner determined the cause of death to be asphyxiation.

*The Suppression Hearing*

On May 29, 2002, the Circuit Court held a hearing on Mr. Gorge's Motion to Suppress. The State called Chief Wesley M. Haverkamp, who was on guard duty at the hospital in Pennsylvania between October 30 and November 2, working the midnight shift. He testified that Mr. Gorge was in and out of consciousness and that he seemed to be in pain. Officer Lawrence Burger, Jr., was on guard duty at the hospital from 8:00 a.m. until 5:00 p.m. on November 1. He described Mr. Gorge's injuries, noting that he had stitches on his neck from "ear to ear," scratches and marks on his arms and legs, and puncture wounds. Officer Burger testified that Mr. Gorge was receiving medication in a pill form and through an IV, though he did not know what medication they were giving him. Officer Burger also testified that Mr. Gorge was restrained with shackles on one ankle and straps on both wrists. Officer Burger was present when two Baltimore County police officers arrived to interview Mr. Gorge.

Detective Kurt Wilhelm and Detective Alan Meyer, from Baltimore County, arrived at the hospital at 2:00 p.m. on November 1. Detective Wilhelm testified that prior to November 1, he had called the nursing staff several times to be updated on Mr. Gorge's condition. He also testified that on the day of the interview with Mr. Gorge, he contacted the police department in Pennsylvania and they informed him that Mr. Gorge was conscious and could be interviewed. Detective

Wilhelm did not inquire about any medications that Mr. Gorge may have been taking, prior to interviewing him.

Detective Wilhelm testified that when he and Detective Meyer arrived at the hospital, Mr. Gorge was awake and appeared to understand who they were. Detective Wilhelm told Mr. Gorge that they wanted to talk with him about what happened in Baltimore County, and according to Detective Wilhelm, Mr. Gorge agreed to talk with them. Detective Wilhelm described Mr. Gorge's demeanor as calm, alert, quiet, and subdued. Detective Wilhelm read Mr. Gorge his rights [1] and he initialed each right and signed the form. According to Detective Wilhelm, Mr. Gorge did not want to write a statement, but he agreed to respond to questions. Detective Wilhelm's testimony continued as follows:

> The first question I asked was, "How are you feeling?" His answer was, "Bad." I asked him, "Do you want to talk to us about what happened in Baltimore?" He said, "Yes." I asked him, "Are you up to it?" He responded, "Yes." I said, "Can you remember what happened this weekend?" He answered, "I guess so." I said, "What happened at your grandfather's house?" To this question, he didn't respond verbally. He just lowered his head and shook his head no. I said, "how did you get your grandfather's van?" He responded, "I took it." I asked him, "Did you hit your grandfather?" He answered, "Yes." The next question was, "Why did you hit him?" He said, "Yes, I don't know." I asked him, "Were you and your grandfather fighting?" He answered, "A little bit." Next question was, "Why did you go over to your grandfather's house? To get money from him?" He answered, "Yeah." Next question is, "Did he give you any money?" He answered, "No, he wouldn't give me any." The following question is, "Did you get into an argument after he would not give you any money?" He said, "Yeah." Next question is, "what happened after that?" He responded, "We started fighting." Question: Did you

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

hit your grandfather in the head with a bottle? Answer: Yes. Question: What kind of bottle? Answer: A drink bottle. Question: How many times did you hit him with the bottle? Answer: Twice. Question: Then what happened? The bottle broke. Question: What happened to your grandfather when the bottle broke? Answer: He pretty much went out.

Detective Wilhelm continued to tell of his interview with Mr. Gorge and testified that Mr. Gorge admitted to taking money, a van, and a shotgun from his grandfather. He also told the detective that he had tried to clean up after the fight and that he was not high but sick when he went to his grandfather's house. After Detective Wilhelm finished his questioning of Mr. Gorge, Detective Meyer asked him a few questions about the clean-up and the location of the body. Detective Wilhelm testified that at the conclusion of the questioning, which lasted almost two hours, Mr. Gorge read the statement and signed it, indicating that he understood what it said and that it was given voluntarily.

Defense counsel did not call any witnesses, but did admit Mr. Gorge's medical records into evidence for the purpose of showing that he was hospitalized with very serious injuries. The State stipulated that the records could be admitted, but the State did not agree as to the interpretation of the records, arguing that the interpretation would require expert testimony.

Defense counsel argued that Mr. Gorge's serious medical condition prevented him from making a voluntary statement to the police. She also argued that the police should have determined if Mr. Gorge was under the influence of any medication before interrogating him. The trial judge denied the motion to suppress and stated:

I am satisfied that the Miranda warnings were given to the Defendant in scrupulous detail. Detective Wilhelm couldn't have done anything more. He read each right to the Defendant individually. Then he had the Defendant go back and read each right and initial each right. I don't see

any requirement for any type of clearance from a physician. The Defendant was conscious. I found the testimony of Detective Wilhelm to be very credible. He indicated that the Defendant was alert. There were no promises made, no threats made, no inducements. The Defendant made the statement voluntarily. The substance of the questions and the answers in and of themselves to me demonstrate that the Defendant was perfectly lucid.

\* \* \*

He is asked in the beginning, how are you feeling. Bad. Next question, do you want to talk to us about what happened in Baltimore. Yes, he does. Are you up to it. Yes. I interpret that question to be a broadly worded question, are you fit enough to answer these questions. So, I think that the detective asked an appropriate number of questions in the beginning. The Defendant certainly had every opportunity to say no, I don't want to answer any questions. I don't feel well enough to answer these questions. I am sure the Defendant was feeling bad. Having heard the nature and extent of his injuries, I am sure he was feeling not so good, but feeling bad does not mean you can't make a voluntary statement. Being in the hospital does not mean you can't make a voluntary statement.

Now, quite frankly, in evaluating the evidence I was concerned about the fact that the Defendant was in essence confined to the bed and couldn't leave the bed. I think that the restraints there were of little consequence and didn't have any effect on the Defendant given his medical condition. From what I have heard, he was not going anywhere at all anyway. He was in bed. It wasn't like these restraints that were put on him by the hospital personnel in any way or were to influence him to make the statement [sic]. So, for all the reasons the Court has stated, the motion is denied.

## The Sentencing

On November 12–14, 2002, Mr. Gorge was tried by jury and convicted of one count of first-degree felony-murder, one

count of premeditated murder, and one count of robbery. On March 3, 2003, the Court denied a motion for new trial and then held a sentencing hearing, which began with defense counsel questioning whether the State filed a written notice of an intention to seek a life sentence without the possibility of parole. Defense counsel stated that she knew "early on" that the State was going to seek that sentence. She also stated, however, that neither she, nor the State could locate a copy of any written notice to that effect in their files. Defense counsel stated that "the Defense had been put on notice some time ago prior to the trial that the State was going to be seeking this sentence at the conclusion of the trial. From what I remember, I thought the State did hand up a paper or certainly made it clear on the record they were seeking this sentence." The circuit court judge noted that after the trial, there had been discussion of a pre-sentence investigation because the State was seeking life without the possibility of parole. Defense counsel concluded her argument by stating,

I will submit to the Court. We certainly were given oral notice prior to today. I will defer to the Court and as to the record as to whether or not our submissions that we have had prior notice satisfies the requirement. The State has filed written notice in written form today.

\* \* \*

Your honor, again, as I said before, the Defense certainly had oral notice thirty days prior to even the June trial date that we originally had, that the State was going to seek the sentence that it was seeking. Again, Your Honor, we will submit that we had oral notice. Whether or not that satisfies the requirements of the statute is a matter for this Court to decide or perhaps for the appellate court to decide.

The State relied on an October 16, 2002 letter in which it made a plea offer to Mr. Gorge. The letter also contained a statement that the State would argue for a sentence of life without the possibility of parole, "pursuant to the Notice that has been filed." The October 16 letter was not received thirty days before trial, but it made reference to a notice that

allegedly had been filed timely. The Court reviewed the docket entries and informed the parties that nothing indicated that any notice had been filed. The Court concluded that it would sentence Mr. Gorge "on the basis that the Defendant did have notice."

The Court sentenced Mr. Gorge to life without the possibility of parole for the first murder conviction and to fifteen years for the robbery. On appeal, the Court of Special Appeals affirmed the circuit court judgment and stated:

We agree with Judge Dugan's analysis. There is no indication in the record of this case, that when appellant was sentenced on March 3, 2003, he did not have at least 30 days notice that the State was seeking a sentence of life without the possibility of parole. Our rejection of appellant's "written notice" argument "shall not prejudice [his] right to assert [this claim] in a post-conviction proceeding, should he desire to do so." *Mosley v. State*, 378 Md. 548, 573, 836 A.2d 678 (2003).

On August 25, 2004, we granted Mr. George's petition for *writ of certiorari*.

## STANDARD OF REVIEW

The first issue raised in this case, whether Mr. Gorge may be sentenced to life without the possibility of parole without having received written notice of the State's intention to pursue that sentence, is purely a matter of law, involving the interpretation of a statute. As such, our review is *de novo*. *Salamon v. Progressive*, 379 Md. 301, 307, 841 A.2d 858, 862 (2004). The second issue, whether Mr. Gorge made a voluntary confession to the police, is a mixed question of law and fact. *Winder v. State*, 362 Md. 275, 310, 765 A.2d 97, 116 (2001). As a result, "we undertake a *de novo* review of the trial judge's ultimate determination on the issue of voluntariness. Our review of the circuit court's denial of appellant's motion to suppress is limited to the record of the suppression hearing." *Winder*, 362 Md. at 310–11, 765 A.2d at 116. We note that while we are required to make our own independent

assessment from the record as to whether the statement is voluntary, "we accept the trial judge's factual findings as correct unless they are clearly erroneous. . . ." *Hoey v. State,* 311 Md. 473, 484, 536 A.2d 622, 627 (1988).

## DISCUSSION

### The Sentence

 Mr. Gorge argues that the circuit court should not have sentenced him to life without the possibility of parole because the record does not reflect that the State gave him timely written notice, as required by statute. The State asserts that Mr. Gorge received oral notice well in advance of the trial date (a fact that he concedes) and that such notice satisfies the statute. The State argues, in the alternative, that Mr. Gorge waived his right to receive written notice because his counsel agreed at the sentencing hearing that she had actual notice before trial that the State would seek the sentence of life without the possibility of parole. We agree with Mr. Gorge.

 As an initial matter, we hold that Mr. Gorge did not waive his right to appeal the question of whether the notice given by the State satisfied the statute. The State argues that defense counsel acquiesced in the trial court's ruling and, as a result, has no basis to appeal from that ruling. While defense counsel admitted to having actual notice of the proposed sentence and stated that she would "submit to the Court," she also stated "[w]hether or not that satisfies the requirements of the statute is a matter for this Court to decide or perhaps for the appellate court to decide." We believe that was sufficient to satisfy Md. Rule 8–131, providing in pertinent part that "[o]rdinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court." [2]

Section 2–201 (b) of the Criminal Law Article provides:

---

**2.** Insofar as the State is making the additional argument that the defendant waived the requirements of the statute itself, we note that

(b) *Penalty.*—(1) A person who commits a murder in the first degree is guilty of a felony and on conviction shall be sentenced to:

(i) death;

(ii) imprisonment for life without the possibility of parole; or

(iii) imprisonment for life.

(2) Unless a sentence of death is imposed in compliance with § 2–202 of this subtitle and Subtitle 3 of this title, or a sentence of imprisonment for life without the possibility of parole is imposed in compliance with § 2–203 of this subtitle and § 2–304 of this title, the sentence shall be imprisonment for life.

Md.Code (2002), § 2–201(b) of the Criminal Law Article. In addition, § 2–203 provides:

A defendant found guilty of murder in the first degree may be sentenced to imprisonment for life without the possibility of parole *only if:*

(1) at least 30 days before trial, the State gave written notice to the defendant of the State's intention to seek a sentence of imprisonment for life without the possibility of parole; and

(2) the sentence of imprisonment for life without the possibility of parole is imposed in accordance with § 2–304 of this title.

Md.Code (2002), § 2–203 of the Criminal Law Article (emphasis added).

■■■ The cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature. *O'Connor v. Baltimore County,* 382 Md. 102, 113, 854 A.2d

there is no evidence in this record to suggest that the defendant or his counsel, at least 30 days before trial, exercised such a waiver. Nothing said by defense counsel, after the fact at the sentencing hearing, could even be considered an express waiver of the requirements of the statute. Because the facts do not present themselves, however, we will not address whether § 2–203 contemplates permitting a waiver by a defendant of the requirements of the statute.

1191, 1198 (2004). As noted by this Court in *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423, 429 (1995), "[t]he first step in determining legislative intent is to look at the statutory language and '[i]f the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written.' " *Oaks,* 339 Md. at 35, 660 A.2d at 429 quoting *Jones v. State,* 336 Md. 255, 261, 647 A.2d 1204, 1206–07 (1994). We strive to give statutes their "most reasonable interpretation, in accord with logic and common sense, and to avoid a construction not otherwise evident by the words actually used." *Greco v. State,* 347 Md. 423, 429, 701 A.2d 419, 422 (1997). We note also that the statute at issue in this case is an enhanced penalty statute. *Johnson v. State,* 362 Md. 525, 529, 766 A.2d 93, 95 (2001). As such, it is highly penal, and must be strictly construed. *Id.*

The plain language of § 2–203 of the Criminal Law Article requires the State to provide the defendant with timely written notice of the intent to seek the sentence of life without the possibility of parole. "A defendant found guilty of murder in the first degree may be sentenced to imprisonment for life without the possibility of parole only if: (1) at least 30 days before trial, the State gave written notice to the defendant...." We do not see how the words "only if" can be interpreted any other way. "Where the language used is unambiguous, and consistent with the statute's apparent purpose, it should be accorded its ordinary meaning." *Thanos v. State,* 332 Md. 511, 522, 632 A.2d 768, 773 (1993). In addition, " '[w]hen a legislative body commands that something be done, using words such as "shall" or "must," rather than "may" or "should," we must assume, absent some evidence to the contrary, that it was serious and that it meant for the thing to be done in the manner it directed.' " *Id.* (quoting *Tucker v. State,* 89 Md.App. 295, 298, 598 A.2d 479 (1991)).

In the present case, defense counsel admitted to having actual notice of the State's intent more than 30 days before trial. She also stated that "from what I remember, I thought

the State did hand up a paper or certainly made it clear on the record they were seeking this sentence." In reality, however, neither the State, nor the Court could locate the original or a copy of a timely written notice. The statute places the burden for supplying the written notice to the defendant on the State. *See Sucik v. State,* 344 Md. 611, 616, 689 A.2d 78, 80 (1997) (discussing the predecessor to § 2–203 and noting that the burden of giving notice is on the State); *Jones v. State,* 324 Md. 32, 37, 595 A.2d 463, 465 (1991) (noting that "the burden is on the State to prove, by competent evidence and beyond a reasonable doubt, the existence of all of the statutory conditions precedent for the imposition of the enhanced punishment"). The fact that defense counsel admitted to receiving oral notice of the State's intent and that the State may have given "a paper" to the court, does not satisfy the requirements of the statute.[3]

According to § 2–203 of the Criminal Law Article, the court may *only* sentence a defendant to life without the possibility of parole *if* the State gave timely written notice to the defendant. Md.Code (2002), § 2–203 of the Criminal Law Article. In view of the seriousness of the sentence [4] and the unambiguous language of the statute, construing the statute to require timely written notice is the most reasonable construction. *See Melgar v. State,* 355 Md. 339, 347, 734 A.2d 712, 716 (1999) (stating that "an enhanced penalty statute, is highly penal and must be strictly construed so that the defendant is only subject to punishment contemplated by the statute."); *accord Jones v. State,* 324 Md. 32, 38, 595 A.2d 463, 466 (1991). The language of the statute provides no exception for oral notice,

---

3. As noted previously, defense counsel stated that "the Defense had been put on notice some time ago prior to the trial that the State was going to be seeking this sentence at the conclusion of the trial. From what I remember, I thought the State did hand up a paper or certainly made it clear on the record they were seeking this sentence."

4. Section 2–101(b) defines imprisonment for life without the possibility of parole as "imprisonment for the natural life of an inmate under the custody of a correctional facility." Md.Code (2002), § 2–101(b) of the Criminal Law Article.

and we will not add one. *See Gillespie v. State*, 370 Md. 219, 222, 804 A.2d 426, 427 (2002) (stating that "[w]e neither add nor delete words to an unambiguous statute in an attempt to extend the statute's meaning.").

The Court of Appeals of South Carolina has reached a similar conclusion. In *State v. Johnson*, 347 S.C. 67, 552 S.E.2d 339 (2001), Johnson was convicted on September 1, 1999 of armed robbery. *Johnson*, 347 S.C. at 68, 552 S.E.2d at 339. The State asked the trial court to sentence Johnson to life without the possibility of parole because Johnson had a prior armed robbery conviction. *Id.* The trial court refused to impose that sentence, finding that the State failed to give the written notice, as required by the South Carolina statute. 347 S.C. at 69, 552 S.E.2d at 340. Similar to the case before us, the defense counsel in *Johnson* admitted that "[t]here was a lot of talk by the solicitor before trial that he was going to seek life without parole; however, I was never given any notice that he was going to seek life without parole in a written form." [5] 347 S.C. at 68, 552 S.E.2d at 339. On appeal,

---

**5.** In *Johnson*, the clerk's file contained a written notice of the State's intention, dated May 26, 1999. *Johnson*, 347 S.C. at 68, 552 S.E.2d at 339. In addition, in *Johnson*, the State proffered that it had given a copy of the notice to Johnson the same day that it was filed and that it provided a copy to defense counsel by including it in the discovery materials given to counsel. *Id.* The defense counsel denied receiving a copy of the written notice but admitted having actual notice of the State's intent. *Id.* Even so, the trial court would not impose the harsher sentence, finding that "there were no cover letters or other documents in either the solicitor's file or the public defender's file to suggest the State gave defense counsel written notice that it would request a life sentence without parole in the event of a guilty verdict." 347 S.C. at 69, 552 S.E.2d at 339. The Court of Appeals of South Carolina affirmed, holding that actual notice was insufficient in view of a statute that required written notice. *Johnson*, 347 S.C. at 70, 552 S.E.2d at 340.

In the instant case, there was no copy of a purported timely notice in the court's file. The Assistant State's Attorney noted that his file entitled "Life Without Parole Notice" was empty and that he believed it was empty because "we had sent a copy to Ms. Robinson [trial defense counsel]." He also stated that he was going to search his discovery file to try and locate the notice and supplement the record if he found it. As far as we are aware, the record has never been supplemented with any timely written notice.

the State argued that the court should have imposed the sentence of life without parole because defense counsel had actual notice of the State's intent. *Johnson,* 347 S.C. at 69, 552 S.E.2d at 340.

The South Carolina statute requiring the sentence of life without the possibility of parole for certain offenses provided that " '[w]here the solicitor is required to seek or determines to seek sentencing of a defendant under this section, *written notice must be given by the solicitor to the defendant and defendant's counsel* not less than ten days before trial.' " *Johnson,* 347 S.C. at 70, 552 S.E.2d at 340 (quoting § 17–25–45(H) of the South Carolina Code). The Court considered the same principles of statutory construction that we have already discussed:

> "It is well established that in interpreting a statute, the court's primary function is to ascertain the intention of the legislature. When the terms of the statute are clear and unambiguous, the court must apply them according to their literal meaning. Furthermore, in construing a statute, words must be given their plain an ordinary meaning without resort to subtle or forced construction to limit or expand the statute's operation. Finally, when a statute is penal in nature, it must be construed strictly against the State and in favor of the defendant."

*Johnson,* 347 S.C. at 70, 552 S.E.2d at 340 quoting *State v. Blackmon,* 304 S.C. 270, 273, 403 S.E.2d 660, 662 (1991). The Court reviewed the mandatory nature of the language of the statute, and wrote that, "[f]or this Court to dismiss the clear and unambiguous language of the statute and merely require the defendant's counsel to have actual notice of the solicitor's intent to seek life without parole would have the effect of amending the statute. In our view, actual notice ... is insufficient unless and until the General Assembly decides otherwise and amends the statute itself." *Johnson,* 347 S.C. at 70, 552 S.E.2d at 340. We agree with the reasoning of the Court of Appeals of South Carolina.

The State urges us to rely on *Grandison v. State,* 341 Md. 175, 670 A.2d 398 (1995), *cert. denied,* 519 U.S. 1027, 117 S.Ct. 581, 136 L.Ed.2d 512 (1996), to find that the purpose of the notice requirement in this case has been met, and that, therefore, the enhanced sentence may be imposed. In our view, *Grandison* does not support the State's position. In *Grandison,* we discussed, *inter alia,* the notice to the defendant that the State intended to seek the death penalty. *Grandison,* 341 Md. at 221, 670 A.2d at 420. In that case, the defendant was tried and convicted of two first degree murders. *Grandison,* 341 Md. at 193, 670 A.2d at 406. The written notice provided by the State informed the defendant of its intention to seek the death penalty, although it did not specify for which murder it was seeking the death penalty. *Grandison,* 341 Md. at 221, 670 A.2d at 420. Grandison argued that the death sentences he received must be vacated because the State's notice did not tell him if he was facing the death penalty for the murder of Scott Piechowicz or for the murder of Susan Kennedy, or both. *Grandison,* 341 Md. at 221–22, 670 A.2d at 420. We rejected that argument and noted that the relevant statute did not require the State to send separate notices. *Grandison,* 341 Md. at 222, 670 A.2d at 420.[6] Grandison received written notice of the State's intent to seek the death penalty and we held that,

the purpose served by the notice requirement—to allow the defendant the opportunity to marshal his defenses in aid of showing why imposition of the death penalty would be inappropriate in his case—is satisfied by the notice given in this case. The absence of language in the notice to the

---

6. We noted that,

Md.Code (1957, 1992 Repl.Vol., 1994 Cum.Supp.), Art. 27, § 412(b) does not expressly require separate notice of each death sentence sought:

"The sentence shall be imprisonment for life unless ... the State notified the person in writing at least 30 days prior to trial that it intended to seek a sentence of death...."

*Grandison,* 341 Md. at 222, 670 A.2d at 420.

effect that two sentences of death would be sought did not render the notice inadequate.

*Grandison,* 341 Md. at 222, 670 A.2d at 420.

In the present case, the State relies on that language to argue that defense counsel's actual notice of the State's intent to seek life without parole satisfies the purpose of the notice statute. We disagree. *Grandison* is distinguishable from the instant case. There is no question that Grandison received timely written notice. Our decision in that case did not discuss whether Grandison could have been sentenced to death if he had actual notice but not written notice of the State's intent to seek death. Our discussion in *Grandison* of the purpose of requiring notice was not in conflict with our reading of the language of the particular statute at issue in that case. The plain language of the statute in *Grandison* did not require the State to provide two separate notices, and we could not say, considering the purpose of the statute, that two separate notices were required. By contrast, to fall back on the general purpose of the notice statute in the instant case and hold that actual notice will suffice, ignores the plain language of the statute we must construe.[7] Section 2–203 describes what constitutes fair notice-written notice at least 30 days before trial. Simply stated, we are not permitted to ignore the language of the statute.[8] *See Jones,* 336 Md. at

---

7. In support of its contention that actual notice should suffice, the State also urges us to consider Md. Rule 4–245, (enhanced penalties for subsequent offenders), and case law stating that the notice requirement of that rule " 'is and always has been, to inform a defendant fully of the nature of the State's case against him in order that he may intelligently conduct his defense.' " *Carter v. State,* 319 Md. 618, 621, 574 A.2d 305, 306 (1990) (quoting *King v. State,* 300 Md. 218, 231, 477 A.2d 768, 775 (1984)). Our answer to that argument is the same as our answer to *Grandison.* We will not use the general purpose of notice requirements to rewrite § 2–203, which unequivocally obligates the State to give *written* notice to the defendant.

8. Similarly, the Court of Appeals of South Carolina refused to ignore the language of the statute in *Johnson* and stated:

On appeal, the State has attempted to convince this Court of the "obvious purpose" of the notice provision and the "clear intent" of the General Assembly. However, we refuse to delve beyond the clear

261, 647 A.2d at 1206–07 (stating that "[i]f the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written").[9]

In view of our holding that the notice provided in this case did not comply with the requirements of § 2–203 of the Criminal Law Article, we must reverse, strike the sentence of life without the possibility of parole, and remand this case for a new sentencing.[10] In a case involving a sentence as serious

---

and unambiguous words of the statute. If the General Assembly had not intended for the defendant's counsel to receive written notice, it would not have so provided.

*Johnson*, 347 S.C. at 70–71, 552 S.E.2d at 340–41.

9. The State also relies on our discussion in *Grandison* of a colloquy between Grandison and the court that showed that Grandison had actual notice of the State's intent to seek the death penalty for the murders of both victims. The only comments made by this Court on that question were as follows:

The notice from the State to Grandison in this case was sufficient, but even if it had been defective, Grandison clearly was aware that he faced the possibility of a death sentence in both murders. Due process was not offended under these circumstances, and the trial court properly denied the motion to dismiss the death notice.

*Grandison*, 341 Md. at 222–23, 670 A.2d at 421. Grandison's actual notice that the State was seeking the death penalty was not the basis for our decision in that case. As previously noted, the decision was based on the fact that the relevant statute did not require the State to send separate notices. *Grandison*, 341 Md. at 221–22, 670 A.2d at 420. By contrast, in the instant case, the statute clearly requires the State to provide a written notice of its intent to seek life without the possibility of parole, something the State failed to prove that it did in this case.

10. The Criminal Law Article mandates the new sentence that must be imposed. Section 2–201(b) of the Criminal Law Article provides:

(b) *Penalty.*—(1) A person who commits a murder in the first degree is guilty of a felony and on conviction shall be sentenced to:

(i) death;

(ii) imprisonment for life without the possibility of parole; or

(iii) imprisonment for life.

(2) *Unless a sentence of death is imposed in compliance with § 2–202 of this subtitle and Subtitle 3 of this title, or a sentence of imprisonment for life without the possibility of parole is imposed in compliance with § 2–203 of this subtitle and § 2–304 of this title, the sentence shall be imprisonment for life.*

Md.Code (2002), § 2–201(b) of the Criminal Law Article. (emphasis added).

as life without the possibility of parole, it is entirely reasonable to require the State to follow the letter of the law. We suggest that in order to avoid a problem in the future, the State should prepare and send a written notice with a signed certificate of mailing or service, file it with the court, and retain a copy of it in the State's own file. Alternatively, the State could present the defendant with the written notice in open court, (at least 30 days before trial), and state on the record that the notice has been handed to the defendant. If either of those methods are used, there will be no question regarding whether the State provided the written notice as required by the statute.

*The Confession*

■ Mr. Gorge argues that the trial court erred by finding that his statements to the police were voluntarily given. Our response to this contention will not detain us long. A review of the record of the suppression hearing supports the trial court's decision. Detective Wilhelm testified that when he and Detective Meyer interviewed Mr. Gorge, he appeared to understand who they were and agreed to discuss what happened in Baltimore. Detective Wilhelm also described Mr. Gorge's demeanor as calm, alert, quiet, and subdued. Mr. Gorge reviewed and signed a written statement containing the substance of the interview with the detectives, indicating that he understood its contents and that he gave the statement voluntarily. As previously noted, defense counsel admitted Mr. Gorge's medical records but did not call any witnesses. The defense now argues that "[i]t is clear that inasmuch as petitioner was in severe pain, subject to various unknown medications, and emotionally distraught at the time he was interviewed by the officers, his statement is subject to suppression as not having been freely or voluntarily made." Petitioner's Brief at 24.

■ As recently stated in *Knight v. State,* 381 Md. 517, 850 A.2d 1179 (2004),

Only voluntary confessions are admissible as evidence under Maryland law. A confession is voluntary if it is "freely and

voluntarily made" and the defendant making the confession "knew and understood what he [or she] was saying" at the time he or she said it. *Hoey v. State,* 311 Md. 473, 480–81, 536 A.2d 622, 625–26 (1988). In order to be deemed voluntary, a confession must satisfy the mandates of the U.S. Constitution, the Maryland Constitution and Declaration of Rights, the United States Supreme Court's decision in *Miranda,* and Maryland non-constitutional law. *See Ball v. State,* 347 Md. 156, 173–74, 699 A.2d 1170, 1178 (1997). *Knight,* 381 Md. at 531–32, 850 A.2d at 1187 (footnote omitted). The burden is on the State to prove that the confession was "freely and voluntarily made." *Winder,* 362 Md. at 306, 765 A.2d at 113. As described in *Hillard v. State,* 286 Md. 145, 150, 406 A.2d 415, 418 (1979), a defendant's confession may not be used unless it is "shown to be free of any coercive barnacles that may have attached by improper means to prevent the expression from being voluntary."

We have said that we must look at the totality of the circumstances in order to decide the voluntariness of a statement. As noted in *Knight,* we " 'look to all elements of the interrogation, including the manner in which it was conducted, the number of officers present, and the age, education, and experience of the defendant.' " *Knight,* 381 Md. at 533, 850 A.2d at 1188 (quoting *Williams v. State,* 375 Md. 404, 429, 825 A.2d 1078, 1092–93 (2003)). As previously noted, our review of the circuit court's denial of Appellant's motion to suppress is "limited to the record of the suppression hearing." *Winder,* 362 Md. at 311, 765 A.2d at 116.

Based upon our review of the record of the suppression hearing in the instant case and consideration of the totality of the circumstances, we do not think the trial court erred by finding Mr. Gorge's statement voluntary. Although the interrogation took place in Mr. Gorge's hospital room, while he was recovering from serious injuries, the detective's uncontroverted testimony regarding his discussion with Mr. Gorge supports a finding of voluntariness. Mr. Gorge's answers to Detective Wilhelm were lucid and accurate. Mr. Gorge signed a written statement, indicating that he understood what he

was signing and that he gave his statement voluntarily. Moreover, Mr. Gorge did not testify at the suppression hearing and state anything to the contrary. In this case, there was no direct evidence of involuntariness and we cannot say that the trial court erred by finding that the State met its burden of proving the statement was freely and voluntarily given.

## CONCLUSION

In summary, we hold that § 2–203 of the Criminal Law Article requires the record to demonstrate that the State gave the defendant timely written notice of its intent to seek a sentence of life without the possibility of parole. Because the State did not comply with the requirements of § 2–203, the sentence of life without the possibility of parole is stricken and the case is remanded for a new sentencing, at which time the circuit court is directed to impose a sentence of life, in accordance with § 2–201 of the Criminal Law Article. Second, considering the record before the trial court, we hold that the court did not err by denying the motion to suppress and finding that Mr. Gorge's statements to the police were voluntarily given. On that issue, we agree with the Court of Special Appeals.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED IN PART AND THE CASE REMANDED TO THAT COURT WITH DIRECTIONS TO VACATE THE SENTENCE OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR A NEW SENTENCING CONSISTENT WITH THE OPINION OF THIS COURT. BALTIMORE COUNTY TO PAY COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS.*

CATHELL and HARRELL, JJ., Dissent.

Dissenting Opinion by HARRELL, J., which CATHELL, J., Joins.

Although I agree with the Majority opinion's analysis and conclusion regarding Gorge's confession (Maj. op. at 621–22, 873 A.2d at 1183–84), I depart from its discussion and holding that his sentencing was flawed. Accordingly, I would affirm the judgments of the Court of Special Appeals and the Circuit Court for Baltimore County.

Although it is tempting to make a stand, on this record, based on the undisputed timely actual notice given Gorge, I shall not. Nonetheless, if there is a better case illuminating the wisdom of why it is frequently said to be a bad idea to elevate form over substance, I have not seen it. There is no doubt that the pertinent statute requires the State to give written notice, at least 30 days prior to trial, of its intent to seek the penalty of life without the possibility of parole. Md.Code (2002), Crim. Law Art., § 2–203(a). There also is no doubt that the original or a copy of such qualifying written notice is absent from this record. On the other hand, there is equally no quibble that Gorge, through his trial counsel, conceded that he had actual notice of the State's intent in this regard well in advance of 30 days before commencement of trial on 12 November 2002. Thus, the obvious underlying purposes for the statutory notice requirement, that is, to avoid surprise and permit the defendant to consider plea negotiations and/or prepare fully his defense, were vindicated fully here.

For example, the trial judge commented at Gorge's sentencing on 3 March 2003, when Gorge's attorney first posed a question regarding the State's ability to demonstrate manifestly its literal compliance with § 2–203(a) [1]:

---

1. It is not entirely clear on this record what Gorge's complaint below was. When broached at the 3 March sentencing, Gorge's counsel stated:

> There has been discussion [presumably with the prosecutors] as to whether or not the State had actually filed its notice to seek a life sentence without the possibility of parole.

My notes reflect when we first came in for a pretrial conference,[2] the State disclosed to both the Defense and the Court that the State would not be seeking the death penalty because of the fact that the family of the victim did not want this, but the State would be seeking life without parole.

Indeed, Gorge's trial counsel, in the course of the 3 March sentencing proceeding, conceded the accuracy of the trial judge's recollection of what occurred at the pretrial conference, saying

Your Honor, I will be quite candid with the Court, ... [the prosecutors] ... had pretty much early on after I got the case [3] indicated they were going to be seeking a sentence of life without parole.

On other occasions over the course of that proceeding, defense counsel repeated her acknowledgment of receipt of actual notice:

Your Honor, the Defense had been put on notice some time ago prior to the trial that the State was going to be seeking this sentence at the conclusion of the trial.

\* \* \*

---

As a plain reading of § 2–203(a) reveals, the State is not required necessarily to *file* with the circuit court such a notice, only that it give the defendant written notice. To be sure, one possible means that would contribute to proving that timely written notice was given might include "filing" a copy or the original of the written notice (*see* Maj. op. at 620–21, 873 A.2d at 1183–84); even then, however, proof of compliance with the statute conceivably also could be made in a number of other ways not involving filing a paper.

2. The record does not reflect when this pretrial conference occurred, whether prior to the first scheduled trial date (8 July 2002) or thereafter prior to the actual commencement of trial on November 12.

3. Gorge's trial counsel entered her appearance on 19 February 2002. The docket suggests that Gorge's counsel may have "gotten" the case earlier than that. An entry reflects that, on 13 February 2002, "information available to the court indicates that the Public Defender's Office will enter appearance."

[T]he Defense certainly had oral notice thirty days prior to even the June trial date [4] that we originally had that the State was going to seek the sentence that it was seeking. Again, Your Honor, we will submit that we had oral notice.

Of greater significance to me in reviewing the trial judge's resolution of whether the State complied literally with § 2–203(a), however, is the circumstantial indicia in the record that a timely written notice [5] was in fact given. Defense counsel ruminated at different times on the record:

> Somewhere in the back of my mind I thought I remember reading this notice, but unfortunately—not unfortunately. Funny enough neither myself nor the State could find a copy.

> \* \* \*

> From what I remember, I thought the State did hand up a paper or certainly made it clear on the record they were seeking this sentence.

> \* \* \*

> As I said, the State has, *again,* filed notice in accordance with the statute. I will submit to the Court. . . . The State has filed written notice in written form today.[6] (Emphasis added).

In addition, although of possibly less weight, was the prosecutor's representation that:

---

**4.** Actually, as noted *supra,* n. 2, an earlier trial date of 8 July 2002 had been postponed to 12 November 2002.

**5.** The circumstantial evidence refers to a written notice earlier than the untimely one delivered to defense counsel on or about 16 October 2002 contained in a plea offer letter. This form of written notice was received by Gorge 28 calendar days prior to the commencement of trial on 12 November 2002.

**6.** Although defense counsel was referring at the time to a confirmatory, formal written notice submitted contemporaneously by the State at the 3 March proceeding, her use of "again" permitted a reasonable inference to be drawn by the trial judge that counsel also was referring to an earlier, timely predecessor that, unfortunately, no one could produce the original or a copy of at that time.

One of the reasons I know that we have previously filed a written notice, although I cannot put my hand on it, when I do a case like this, I make up separate manilla folders. I basically break down—I have a couple of copies. A discovery of the case file which would be what we would send to Ms. Robinson [Gorge's trial counsel]. I have a copy that I keep just for my records. The third copy which is my working copy of the file. When I make up these manilla folders, I keep things piece by piece. I have a manilla folder in this case entitled "Life Without Parole Notice." It was empty. I believe it was empty because we had sent a copy to Ms. Robinson. At the conclusion of the case I had provided a copy to the Court. It would have the original date on it that we sent it.[7]

My review of the trial judge's oral ruling on the defense's "question"[8] was expansive enough to embrace an implicit finding that a timely written notice, despite its incorporeal status in this record, was given in fact. Although he alluded briefly to the existence of actual notice well in excess of 30 days before trial, he also relied on the circumstantial indicia of a timely written notice in declaring

I am going to proceed in the case on the basis that there was notice given to the Defense.

Specifically, he referred to the 16 October 2002 plea offer letter, which contained the following allusion: "At disposition, the State will argue for Life Without Parole, *pursuant to the Notice that has been filed.*" As mentioned *supra*, although not singled-out by the judge in his oral ruling, the record of

---

7. Neither the Court, prosecutor, nor defense counsel offered an explanation for why no one could produce a file copy or the original of an earlier, timely written notice.

8. I repeat, it is not crystal clear whether the defense was complaining merely that the court's file, as well as her own and the State's personal files, lacked the original or a copy of a timely written notice, or that, in fact, the State failed to give Gorge timely written notice at all. The latter is somewhat problematical as a reasonable assumption to make in light of defense counsel's recollection of an earlier writing in this context.

the 3 March 2003 sentencing proceeding also reflected defense counsel's recollections, in the context of a timely written notice, of "reading [a] notice." Accordingly, from these circumstantial indicia that a timely written notice was given, the trial judge reasonably could infer, as he apparently did, that the State fulfilled its duty to Gorge under § 2–203(a).[9] *See State v. Suddith*, 379 Md. 425, 430, 842 A.2d 716, 719 (2004) (finding that a fact-finder's conclusion "based in whole or in part on circumstantial evidence is no different from [a conclusion] based on direct eyewitness accounts" (citations omitted)).

Judge CATHELL authorizes me to state that he joins this dissent.

---

9. Although not representative of the gold standard (*see* the Majority opinion's suggestions at slip op. 18–19) for proof of literal compliance with § 2–203(a), the record in the present case is adequate to support the trial judge's apparent conclusion that timely written notice was given.