972 A.2d 917

**Abdel Khader DIALLO**

v.

**STATE of Maryland.**

**No. 71 Sept.Term, 2008.**

Court of Special Appeals of Maryland.

June 4, 2009.

24

28

---

Philip J. Sweitzer, Ronald I. Kurland, Baltimore, for appellant.

Mary Ann Ince (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, for appellee.

Panel: DAVIS and WOODWARD, JJ., and CHARLES E. MOYLAN, JR., J. (Retired, Specially Assigned).

DAVIS, Judge.

On December 14, 2007, Abdel Khader Diallo, appellant, was tried upon a "not guilty" agreed statement of facts in the Circuit Court for Baltimore County (Norman, J.) and convicted of first-degree assault and use of a handgun in the commission of a crime of violence. On February 8, 2008, the circuit court sentenced appellant to twenty-five years in prison on the first-degree assault charge, with all but fifteen years suspended and, upon release, to be under supervised probation for five years. As for the conviction on the charge of use of a handgun in the commission of a crime of violence, appellant was sentenced to a concurrent mandatory term of five years in prison, without the possibility of parole.

The core issue raised on appeal addresses the propriety of these criminal proceedings and judgments against appellant in light of appellant's claim that he is entitled to diplomatic immunity. Appellant presents four questions for our review, which we have rephrased as follows:[1]

---

1. The questions, as originally phrased, were:
 1. Whether the circuit court erred when it concluded that appellant was not immune from its criminal jurisdiction under the Vienna Convention on Diplomatic Relations, the United Nations Convention and other U.S. treaty obligations, because his father was not immune?
 2. Whether the seizure and arrest of appellant, as well as the subsequent statement taken by the police while in custody, were unlawful under the Vienna Convention on Diplomatic Immunity, the United Nations Convention, and other United States treaty obligations, given that the Vienna Convention is "self-executing," appellant is the son of a career Assistant Secretary General of the United Nations, and also holds a diplomatic passport from the Republic of Burkina Faso, which its Foreign Ministry issued him independently?
 3. Whether the State of Maryland violated its discovery responsibilities under *Brady v. Maryland* and progeny, when it failed to correct its factually erroneous certification received from the United States Department of State dated September 20, 2007, prior to trial, where the United States Department of State clearly had information in its exclusive control that tended to impeach the certification's credibility and substantially support appellant's claim?

I. Did the trial court err by denying appellant's motion to dismiss on the grounds that appellant was not entitled to diplomatic immunity?

II. Did the trial court err by denying appellant's motion to suppress statements made to the police on the grounds that appellant was not entitled to diplomatic immunity?

III. Did the State fail to comply with its disclosure obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny?

IV. Did the trial court err by denying appellant's motion to suppress statements that he made to the police on the grounds that appellant's confession was knowingly and voluntarily made?

For the reasons that follow, we hold that appellant has waived his challenge to the denial of his motion to dismiss. We resolve all remaining questions against appellant and affirm the judgments of the trial court.

## FACTUAL BACKGROUND

Appellant's trial proceeded upon a "not guilty" agreed statement of facts, the pertinent portions of which we recount *infra.*

On October 22, 2006, David Reeves, who had recently left a party in Rosedale, with a friend, approached appellant on the street and asked if he was selling drugs. When told that appellant was not selling drugs, Reeves became angry and aggressive. Another individual, who remained unidentified in the proceedings, subsequently approached appellant, offered appellant a handgun and explained that Reeves was carrying a substantial amount of money. Appellant took the gun and pointed it at Reeves. When Reeves attempted to grab the

---

4. Whether the trial court erred when it concluded that appellant's statement to the police was voluntary under a totality of the circumstances, where appellant was physically compromised, taking narcotic pain medication, and the police sought to exploit his physically compromised state?

gun, a struggle ensued, during which the gun was fired, wounding Reeves in the neck. Reeves was subsequently treated at Franklin Square Hospital for his injuries.

On October 23, 2006, Detective Ramon Geigel visited Franklin Square Hospital to conduct an investigation of the incident. He soon learned that another individual, later identified as appellant, arrived at Franklin Square Hospital at the same time as Reeves and was treated for a gunshot wound to his chest. Appellant was later transferred from Franklin Square Hospital to Johns Hopkins Hospital for treatment. On October 31, 2006, Reeves identified appellant out of a photo array as the individual who shot him. Appellant was arrested later that day after being discharged from Johns Hopkins Hospital. At the stationhouse, appellant was administered his *Miranda*[2] rights and signed a waiver of those rights, ultimately confessing orally and in writing to his involvement in the shooting.

Based upon the foregoing facts, the trial court found appellant guilty of first-degree assault and use of a handgun in the commission of a crime of violence. Additional facts shall be discussed throughout our opinion as appropriate.

## LEGAL ANALYSIS

Appellant challenges the trial court's denial of (1) his motion to dismiss the charges against him and (2) his motion to suppress statements he made to the police subsequent to his arrest. Appellant's motion to dismiss was premised on the argument that the court lacked jurisdiction over appellant because he was entitled to diplomatic immunity from criminal prosecution based on the position occupied by his father, Mr. Hama Arba Diallo (the Elder Diallo),[3] a former Executive Secretary of the Permanent Secretariat of the United Nations Convention to Combat Desertification (UNCCD). Appellant's motion to suppress was based on two arguments. The claim

---

**2.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**3.** We shall refer herein to Abdel Khader Diallo as "Diallo" or "appellant" and to his father as "Mr. Diallo" or "the Elder Diallo."

first advanced by appellant is that his arrest, and his subsequent confession to the police, were illegal in light of his claim of diplomatic immunity. The second claim of error is that his confession to the police was involuntary.

In addition to requesting a reversal of the trial court's denial of his motion to dismiss and his motion to suppress, appellant also seeks to vacate his conviction based on what he characterizes as the United States State Department's suppression of evidence in relation to the diplomatic status of his father, which should be imputed, according to appellant, to the State of Maryland, affording appellant relief under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny.

We address each of appellant's arguments *seriatim.*

# I

## Diplomatic Immunity—Motion to Dismiss

### A

### Waiver

■ Appellant maintains that the trial court erred "when it concluded that [a]ppellant was not immune from its criminal jurisdiction under the Vienna Convention on Diplomatic Relations, the United Nations Convention and other U.S. treaty obligations...." By identifying the "United Nations Convention," we deduce that appellant is referring to the Convention on Privileges and Immunities of the United Nations, Feb. 13, 1946, 21 U.S.T. 1418. We shall hereafter refer to the Convention on Privileges and Immunities of the United Nations as the "United Nations Convention" and the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, as the "Vienna Convention."

We initially observe that, although appellant generally *mentions* the United Nations Convention in the title to two subsections of his appellate brief, and includes sections 17 through 21 of the United Nations Convention in the pertinent provisions section of his appellate brief, appellant only *discusses* and *explains the significance of* specific articles of the

Vienna Convention. In other words, there is no substantive application of any provision of the United Nations Convention anywhere in appellant's brief. *See Higginbotham v. Public Service Comm'n of Maryland,* 171 Md.App. 254, 268, 909 A.2d 1087 (2006) (observing that we are not required to "to seek out the law in support of a party's appellate contentions") (quoting *Anderson v. Litzenberg,* 115 Md.App. 549, 578, 694 A.2d 150 (1997)).

We further observe that appellant has failed to present, with any particularity, a basis upon which we might review the trial court's denial of his motion to dismiss. Rather, after (1) mentioning the date on which appellant moved to dismiss the charges, (2) outlining the substance of the State's opposition to appellant's motion and (3) reproducing a portion of the trial court's ruling, appellant sets forth the following legal argument, which we quote in its entirety:

> The court erred for reasons which will become clear, *infra,* which error it almost could not avoid: the Department of State was in possession of exculpatory information tending to undercut the credibility of the information in its September 20, 2007 certification,[4] information that also tended to substantially support the [a]ppellant's claim, and evidence it suppressed.

Under Maryland Rule 8–504(a)(5), an appellate brief must contain "argument in support of the party's position." Rule 8–504(a)(4) further requires a party to include a clear and concise statement of the facts material to a determination of the questions presented, with reference to pages of the record or the transcript of testimony contained in the record. In the event that a party fails to comply with this Rule, we retain the authority to "dismiss the appeal or make any other appropriate order with respect to the case." Md. Rule 8–504(c). *See also Klauenberg v. State,* 355 Md. 528, 552, 735 A.2d 1061 (1999). Appellant's argument on this issue, which we have set forth above, comes quite close to conceding that the trial court

---

4. We discuss this certification in detail throughout the remainder of the opinion.

could not "avoid" error and, consequently, did *not* err in denying appellant's motion to dismiss. Moreover, appellant sets forth no authority in support of his argument, pertinent to a trial court's obligations in ruling upon a motion to dismiss. Instead, appellant appears to bootstrap his challenge to the denial of the motion to dismiss to his argument that the prosecution suppressed evidence, in violation of *Brady v. Maryland, supra,* and its progeny—an argument that we discuss and reject *infra.*

We also observe that appellant has failed to explain or refer to substantial portions of the record relevant to his argument to the trial court and the basis for the trial court's denial of his motion to dismiss, which we have concluded are critical to determining the merits of appellant's challenge to the trial court's ruling on appeal.

■ "[A]rguments not presented in a brief or not presented with particularity will not be considered on appeal." *Klauenberg,* 355 Md. at 552, 735 A.2d 1061. *See also Beck v. Mangels,* 100 Md.App. 144, 149, 640 A.2d 236 (1994) (explaining that we may decline to consider the merits of a question presented but not supported by substantial argument). We decline to fashion an argument, on appellant's behalf, in support of his challenge to the trial court's denial of his motion to dismiss. We deem this issue to be waived.

We note, however, that even if not waived, appellant's argument is without merit.[5] To illustrate this point, we set forth a timeline of the arguments advanced *sub judice* in support of or in opposition to appellant's motion to dismiss and the basis for the trial court's ultimate denial of the motion.

## B

### Appellant's Motion to Dismiss

On August 13, 2007, appellant moved to dismiss the charges against him, claiming that he enjoyed diplomatic immunity

---

5. This shall further become evident in light of our disposition of the other issues raised in this appeal.

from prosecution based on his father's status as the former Executive Secretary of the Permanent Secretariat of the UNCCD, stationed in Bonn, Germany. Appellant specifically asserted that this immunity was conferred by three statutes: (1) art. IV, section 11 of the United Nations Convention, (2) art. 31.1 of the Vienna Convention and (3) sections 288–288f of the International Organizations Immunities Act, 22 U.S.C.[6] According to appellant, this immunity was accorded to him by virtue of his father's diplomatic status. Moreover, appellant asserted that he held (1) a diplomatic passport from his father's "sending State" and native country, Burkina Faso; (2) expired, but renewable, diplomatic identification from his father's "receiving State," the Federal Republic of Germany; and (3) current diplomatic identification from the United Nations. Appellant further posited that, in light of this diplomatic immunity, the court was precluded from exercising jurisdiction over him.

Additionally, appellant, inexplicably, never mentions in his appellate brief that he also submitted, in support of his motion to dismiss, an August 9, 2007 attestation by Frank M. Meek, Chief of Administration and Finance for the United Nations Secretariat of the Convention to Combat Desertification, which we set forth below:

This is to certify that Mr. Hama Arba Diallo, a national of Burkina Faso, is the former Executive Secretary of the Permanent Secretariat of the United Nations Convention to Combat Desertification (UNCCD), and as such was the head of the UNCCD.

In this position the former Executive Secretary held the level of Assistant Secretary General of the United Nations, which position entitled him to diplomatic status. During Mr. H.A. Diallo's tenure, Mr. H.A. Diallo's son, [appellant], was a dependent of Mr. H.A. Diallo and resided with Mr. H.A. Diallo in Bonn, Germany, until [appellant] commenced his college education, and thereafter, he resided with Mr.

---

**6.** Appellant does not, on appeal, argue the applicability of the International Organizations Immunities Act.

H.A. Diallo from time to time during breaks in his studies. Copies of an attestation dated 3 July 2002 indicating that [appellant] was a dependent of Mr. H.A. Diallo, a request for home leave dated 07 March 2003, a Personnel Action dated 01/01/2002 indicating that [appellant] is a dependent child, another attestation dated 21 August 2003 indicating that [appellant] was the dependent son of Mr. H.A. Diallo, and a request for Educational Grant Travel dated 20 August 2003 are attached. These documents bear the UNCCD seal and my initials indicating that they are true and exact copies of the original documents included in the UNCCD files.

It should be noted that Mr. H.A. Diallo resigned his position at the secretariat effective 19 June 2007, and is currently preparing for his return to Burkina Faso later this year. A copy of the letter from the Secretary General of the United Nations, Mr. Ban Ki–Moon accepting Mr. H.A. Diallo's resignation as of 19 June 2007 is attached.

It is my understanding that [appellant] will be accompanying Mr. H.A. Diallo to Burkina Faso.

Should you have any further questions please contact me.

On September 20, 2007, the State responded to appellant's Motion to Dismiss, countering that neither appellant nor his father enjoyed diplomatic immunity in the United States. In support of this argument, the State submitted the following certification, dated September 20, 2007, which was issued by Holly S.G. Coffey, Deputy Assistant Chief of Protocol for Diplomatic Affairs at the United States Department of State:

This is to certify that I, Holly S.G. Coffey, Deputy Assistant Chief of Protocol of the United State[s] Department of State, am responsible for registering and maintaining the official records of diplomatic and consular officers, and other employees of foreign governments and international organizations in the United States and its territories and, in coordination with the United States Mission to the United Nations, of members of Permanent Missions to the United Nations and officials of the United Nations.

The official records of the Department of State, including those of the United States Mission to the United Nations, indicate that Mr. Hama A. Diallo was notified by UN Secretariat to the United Nations in New York as a Special Representative of Secretary General (United Nations Conference on Environment and Development) on August 2, 1990. He served in that capacity until his assignment was terminated on June 22, 1993. At the time of Mr. Diallo's appointment, his son, [appellant], was notified to the Department as a member of his family forming part of his household. *Accordingly, he is not entitled to diplomatic privileges and immunities in the United States.*

(Emphasis added).[7] According to the State, this State Department certification was conclusive as to the Elder Diallo's diplomatic status, requiring a denial of appellant's Motion to Dismiss.

In addition, the State referred to excerpts from a publication produced by the State Department, which explained that "[t]he only authoritative identity document [establishing the status of a person asserting immunity] is the identity card issued by the U.S. Department of State, Office of Protocol or by the U.S. Mission to the United Nations, in the case of persons accredited to the United Nations." U.S. Department of State, DIPLOMATIC AND CONSULAR IMMUNITY: GUIDANCE FOR LAW ENFORCEMENT AND JUDICIAL AUTHORITIES, (Washington, D.C., 1998 rev.) at 10. It further explained that holders of foreign diplomatic passports containing U.S. "A" or "G" visas *might* be entitled to privileges and immunities in the United States, although such immunity could not be conclusively established from the existence of the visa alone. *Id.* The State thus asserted that the documents attached by appellant to his Motion to Dismiss "do not expound upon what kind of diplomatic status was awarded to [appellant's] father or [ap-

---

7. The State observes that this document was admitted as an exhibit at the hearing on the motion to dismiss without objection. Appellant argues, in his reply brief, that it stipulated only to the admissibility of the State Department certification and not to its veracity.

pellant] and as such the letters and papers invariably fail to prove what kind of immunity was conferred upon [them] and where such immunity applies." The State added that "even assuming, *in arguendo,* that the letters and papers prove diplomatic immunity for [appellant] in Germany, they do not prove diplomatic immunity in the United States." The State concluded its argument by stating that, if the court were to determine that appellant was entitled to diplomatic immunity, the State would then request an opportunity to seek an appropriate waiver of that immunity.

On November 2, 2007, appellant filed an "[Appellant's] Reply to State's Answer to [Appellant's] Motion to Dismiss Indictment," wherein appellant argued that immunity flowed to appellant as a matter of law under the relevant international conventions. Appellant also included a copy of the following October 29, 2007 attestation by Meek:

This is to certify that Mr. Hama Arba Diallo, a national of Burkina Faso, is the former Executive Secretary of the Permanent Secretariat of the United Nations Convention to Combat Desertification (UNCCD), and as such was the head of the UNCCD from its inception in 1999 to 19 June 2007. From 1993 to 1999 Mr. Diallo was in charge of the predecessor organization that founded the UNCCD.

In this position the former Executive Secretary held the level of Assistant Secretary General of the United Nations, *which position entitled him to diplomatic status, both in Germany and on all official missions to all member country parties of UNCCD.* The United States of America, since 2001, has been a party to the UNCCD, and accordingly all of Mr. Diallo's *official travel* to the United States of America since 2001 has been with full diplomatic status. Also, through responses to periodic inquiries of the Embassy of the United States of America in Berlin, Germany, the Department of State has been notified of Mr. Diallo's position within the secretariat of the UNCCD. With the predecessor organization from 1993 to 1999, as for all United Nations personnel, all of his official travel, including to the United States of America, he had diplomatic status with

respect to all of the countries, which he periodically visited while seeking the ratification of the Convention.

Since UNCCD's headquarters is situated in the Federal Republic of Germany, and not in the United States of America, the United Nations and the secretariat of the UNCCD were not required to notify the Department of State of Mr. Diallo's then current status, which was higher than previous grades that he held while based in New York until 1993.

It should be noted that Mr. H.A. Diallo resigned his position at the secretariat effective 19 June 2007.

Should you have any further questions, please contact me.[8]

(Emphasis added).

Citing to *U.S. ex rel. Casanova v. Fitzpatrick*, 214 F.Supp. 425, 434 (S.D.N.Y.1963), appellant asserted that State Department certifications are ordinarily, but not always, entitled to conclusive weight in court.[9] Additionally, appellant challenged the State's argument insofar as it was premised upon the assumption that appellant's father resided in the United States:

As such, arguably, [the Elder Diallo's] 'receiving State' is *not* the United States at all: it is the *United Nations*, the true 'receiving entity in tandem with the Federal Republic of Germany. His diplomatic immunity, conferred by the United Nations and the United Nations Convention, as well as the [UNCCD], thus followed him from country to country, where his United Nations endeavors required him to travel. However, he still enjoyed immunity from the civil

---

**8.** As with the previous attestation by Meek, appellant has not referred to the October 29, 2007 attestation in his appellate briefs and makes no argument to this Court, in light of Meek's representations, explaining how appellant may be entitled to diplomatic status in the United States even if the Elder Diallo is not on official travel to this country.

**9.** On appeal, appellant concedes that State Department certifications are conclusive—a matter that we shall address, *infra*.

and criminal jurisdiction of the United States of America—
or any prosecuting state authority—which is absolute.

(Internal citations omitted).

Appellant further cited to the 1976 United Nations Juridical
Yearbook in support of his argument that the United Nations
has "broadly" construed the immunity applicable to appellant,
"interpreting the phrase 'while exercising their functions and
during their journey to and from the place of the meeting,' to
mean 'during the entire period of presence in the State.' "[10]

On September 25, 2007, the circuit court denied appellant's
motion to dismiss. The circuit court later granted appellant's
motion to reconsider its denial of the motion.[11] A hearing was
held on November 13, 2007, during which appellant presented
the following exhibits to the court: (1) various United Nations
attestations, including those of Frank Meek; (2) appellant's
German diplomatic identification card; (3) a copy of the Elder

---

**10.** The United Nations Yearbook entry to which appellant referred
consists of an August 26, 1976 letter from the United Nations Secretary
General to an attorney of a member of a permanent mission to the
United Nations. The privileges and immunities of a person designated
by a United Nations Member State as its representative are governed by
art. IV, section 11 of the United Nations Convention and not by art.
V, sections 18 and 19 of the United Nations Convention, which apply to
officials of the United Nations, a distinction upon which we shall
elaborate *infra.*

**11.** Appellant's request was premised on the argument that the court
was required, under Maryland Rule 4–252(g), to state its factual find-
ings on the record, which it had not done in issuing the first denial. In
his appellate brief, appellant includes a footnote in his recitation of the
facts, where he states that the trial court never vacated its original
denial of his motion to dismiss. According to appellant, this "disadvan-
taged" appellant because "the court had ruled on the matter illegally,
and never set aside its original ruling, prior to 'reconsidering' the
matter." Appellant then "urges this August tribunal that the Court's
failure to vacate its original determination and start the proceeding on
an even playing field with no determination to revise, was also prejudi-
cial error, requiring *vacatur* or reversal." Appellant has not properly
raised this allegation as a question for us to consider. *See* Md. Rule 8–
504(a)(3). Nor has appellant offered any substantive legal argument to
support his request. *See* Md. Rule 8–504(a)(5). Any such argument is
thus waived and we decline to address it further. *See* Md. Rule 8–
504(c).

Diallo's United Nations "laissez-passer," issued on February 27, 2006 and expiring on January 15, 2008 and identifying the Elder Diallo in connection with the title "Executive Secretary"; (4) a United States G–4 visa, issued April 20, 2006 and expiring on April 18, 2007, identifying the Elder Diallo in connection with the UNCCD and including the annotation, "Bonn, Germany"; (5) a diplomatic passport from Burkina Faso, issued on February 20, 2006 and expiring on February 19, 2011, identifying the Elder Diallo as a United Nations Executive Secretary; and (6) a copy of the Elder Diallo's German diplomatic identification card.

At the November 13, 2007 hearing, both parties argued the conclusive nature of the State Department certification as to appellant's diplomatic immunity. Appellant further argued that his father was entitled to diplomatic immunity under art. IV, section 11 of the United Nations Convention, which confers certain privileges and immunities upon "Representatives of Members to the principal and subsidiary organs of the United Nations and to conferences convened by the United Nations" while "exercising their functions and during their journey to and from the place of meeting. . . . " Appellant placed particular emphasis on his assertion that his father had diplomatic immunity while on official travel to the United States, as evidenced by the United Nations attestations by Frank Meek and the U.S. G–4 visa awarded to appellant's father. Thus, the trial court considered arguments from both counsel on this particular matter. Accordingly, the following discussion took place, without objection by appellant:

[THE STATE]: Your Honor, if you look at the defense argument, they are saying as a member, his father being a member of the United Nations delegation, that they can go into any country that is a United Nations member at any time without notifying that country, commit crimes and have immunity and that—it violates the spirit.

THE COURT: I don't think that is what counsel is saying. As I read some of the documents, they have to be there, as I understand it, for the Mission purpose. *Am I wrong about that? You have to be there for the Mission*

*purpose. He decides he wants to come to the United States to go to Disney world, that is a little different, as I read it.* Go ahead.

(Emphasis added).

In addition, the following colloquy transpired between counsel and the court:

THE COURT: And then you handed up a page one of twelve of what a G–4 is and it says, "issue to personnel of any rank who are proceeding to the United States to take up an appointment as a designated international organization, including the United Nations." It says, parenthetically, "members of their immediate family may also be issued G–4 visas except." And that is where it stops because there is no next page.

Now, what evidence do I have that for all intents and purposes [appellant's] father was coming to the United States for a designated purpose? Where is the evidence of that, in terms of his Mission?

[APPELLANT'S COUNSEL]: The attestation of Mr. Meek.

THE COURT: Would that be Defendant's [Exhibit] 7? I believe it is dated October 29th. That is Defendant's [Exhibit] 7, which says at the bottom, it goes on to explain—this is the one where you argue that his diplomatic status actually increased.

[APPELLANT'S COUNSEL]: Right.

THE COURT: It says at the bottom, "with the predecessor organization from 1993 to 1999." Talking about your client's father's involvement in UNCCD.

[APPELLANT'S COUNSEL]: Right.

THE COURT: Okay. "As for all United Nations personnel, all of his official—of his official travel, including to the United States of America, he had diplomatic status with respect to all of the countries which he periodically visited while seeking the ratification of the Convention," which I think dovetails into the State's argument that it has to be for the purpose of their Mission.

Now, what evidence do I have that on the day of this offense your client's father, *and that is how he gets his immunity, agreed*?

[APPELLANT'S COUNSEL]: *Correct.*

THE COURT: Your client's father was in the United States with regard to seeking the ratification of the Convention?

[APPELLANT'S COUNSEL]: Well, actually, Your Honor, he would not have been in the United States to seek the ratification of the Convention in 2007 or 2006 because the Convention was ratified in 2001. But he is here on official business with UNCCD with respect to implementing the Convention and—

THE COURT: It doesn't say that, counsel.

[APPELLANT'S COUNSEL]: I'm sure that—

THE COURT: *With all due respect, and that is why I wanted to recess, to read all of these documents, it doesn't say that. It says, "ratification of the Convention." Doesn't say continuation. Doesn't say implementation. It says ratification.*[12] What evidence do I have that your client's father was in the United States, or wherever, that it was for that purpose, the ratification of the Convention? Because that is his Mission.

[APPELLANT'S COUNSEL]: Actually, Your Honor, you have the Department of State's G–4 Visa dated 2006,

---

**12.** It might have been prudent for appellant's counsel to have clarified to the trial court that there were two distinct statement's in Meek's attestation regarding the Elder Diallo's diplomatic status in the United States. The first asserted that, from 1993 to 1999, when the Elder Diallo was "in charge of the predecessor organization that founded the UNCCD," he was entitled to diplomatic status with all countries, including the United States of America, which "he periodically visited *while seeking the ratification* of the convention." (Emphasis added). It further asserted, however, that in his former position as Executive Secretary of the Permanent Secretariat of the UNCCD, which he held from its inception in 1999 to his resignation on June 19, 2007, the Elder Diallo was entitled to full diplomatic status on *all official travel* to the United States since 2001, when the United States became a party to the UNCCD.

April, which would only be issued to him for official travel to the United States. The State Department would not give him a visa if he were not here on official business. And as we write in the reply, the Convention itself, the United Nations has construed immunities very broadly, not narrowly.

THE COURT: Anything else?

[APPELLANT'S COUNSEL]: That is it.

THE COURT: From the State?

[THE STATE]: No, Your Honor.

The trial court again denied appellant's motion to dismiss, issuing the following ruling:

THE COURT: All right. Having reviewed the various pleadings in the files as well as the evidence that has been presented to me today, both from the State and the defense, the Court is persuaded that your client did not enjoy diplomatic immunity and, therefore, your motion is denied.

On November 27, 2007, appellant filed a "Second Motion to Alter or Amend, or Alternatively, to Reconsider and Vacate Order Denying [Appellant's] Motion to Dismiss." In support of this motion, appellant attached, *inter alia*, (1) an October 23, 1998 letter of appointment from the United Nations appointing the Elder Diallo as Executive Secretary of the UNCCD, in the category of Assistant Secretary–General, effective January 1, 1999 and expiring on December 31, 2001; and (2) a document entitled "Senior Officials of the United Nations and Officers of Equivalent Rank Whose Duty Station is New York," dated June 14, 2006, which identifies the Elder Diallo as the Executive Secretary of the UNCCD, stationed in Bonn. Appellant's motion again cited to, and emphasized his previous interpretation of, art. IV, Section 11 of the United Nations Convention. The motion was devoted primarily to challenging the trial court's emphasis on whether the Elder Diallo traveled to the United States to promote the ratification of the UNCCD. According to appellant, since 2001, when the United States became a party to the UNCCD, Mr. Diallo continued to work towards the ratification of the UNCCD by

other United Nations Member States and the implementation of the UNCCD by those states that were parties to it, requiring his travel to the United Nations Headquarters in New York.

Appellant also moved to suppress his statements to the police, based, *inter alia,* on this same claim of diplomatic immunity.

On December 14, 2007, the trial court convened a hearing on these motions. Appellant, from the outset, requested a continuance, explaining that, the day before the hearing, appellant faxed information to the United States Mission to the United Nations (U.S. Mission) and was waiting for a response, which, according to appellant, would bolster his claim of diplomatic immunity. The trial court denied the request for a continuance on the grounds that appellant had one month between the November 13, 2007 hearing and the December 14, 2007 hearing to procure such information. Appellant further argued, without providing any basis for this argument, that the office that issued the certification was "not the correct area of the Department of State to make a comment on diplomatic immunity." Rather, according to appellant, the U.S. Mission was tasked with that responsibility. The State disagreed.

The trial court ruled:

Your client bears the burden of proving that is he [sic] a diplomat. Based upon what both sides have presented to me and I have read, if in fact he is entitled to that, if there is proof that he is entitled to that and that comes to the Court after the fact, even after a conviction, the conviction would have to be reversed.

The problem would be, not the problem, but the circumstances would be that it would involve an additional hearing. You're presupposing you can bear your burden. I don't know if you can or not. *I am only allowed to rule on what is presented to me to date. What has been presented to me to date is exactly what counsel for both sides have presented in argument as well as in the papers submitted to the Court.* Beyond that I'm not going to speculate. It would

be inappropriate for me to speculate. So I am prepared to make a ruling.

I understand your request. I'm confident that if you are right, that you can bear your burden even after the fact, then justice—there is a mechanism in our society, our particular system of justice to deal with that. *But I'm duty bound to make the calls that I'm duty bound to make based upon the information presented.*

It strikes me that, again, [appellant's counsel], no disrespect, you seem to be the expert, at least amongst the group of people sitting in this courtroom, and for you to suggest that you are just now finding out that a branch of our ominous and omnipotent government made a mistake is kind of evidence of the fact, is it not? If you are saying that one branch made a mistake, what makes you so convinced that the people you are now talking to aren't wrong?

And since you bear the burden, I don't know, I'm not going to get in the middle of litigation, I'm not convinced that a simple letter would be sufficient.

You know, both sides in this case submitted papers and supporting documentation without objection by the other side. Had there been objection by either side in terms of their admissibility, not their persuasive effect, in terms of admissibility, we might be in a whole different ball game. And I emphasize might. I'm not suggesting there are post conviction issues here. I'm suggesting might. There may have been other reasons why they may have been admissible. But having said all that, this Court is going to do what I swore an oath to do and that is make the decisions based on the information presented to me. It is my judgment at this point both sides have had ample time to develop whatever information to present to the Court in court, whatever information you believe is relevant and material to this issue.

Thus, the trial court denied appellant's motion a third time, ruling as follows:

All right. Thank you. Based on the information and the arguments of counsel, I find that the defendant's father, *I find as a fact based upon what has been presented to me that the defendant's father was not a diplomat at the time of this alleged offense,* and therefore his son is not entitled to the immunity that he would have been entitled to had his father been a diplomat.

(Emphasis added).

Later that day, after considering appellant's argument on his motion to suppress court further ruled:

Okay. First, as to the diplomatic immunity. We had motions on this issue. *I have made the ruling that I have made and I'm not going to change that.*

I reviewed, as I said, the—all of the documentation, the supporting documentation that accompanied the motions, including State's Exhibit Number 1, which was a *State Department statement from a Holly S.G. Coffey upon which the Court, among other things, relied upon to make the determination that [appellant] was not a diplomat.*

(Emphasis added).

## C

### Diplomatic Immunity

The determination of whether a person has diplomatic immunity involves a mixed question of law and fact. *United States v. Al–Hamdi,* 356 F.3d 564, 569 (4th Cir.2004). The United States Court of Appeals for the Fourth Circuit has examined such issues using a " 'hybrid standard, applying to the factual portion of each inquiry the same standard applied to questions of pure fact and examining *de novo* the legal conclusions derived from those facts.' " *Id.* (quoting *Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond,* 80 F.3d 895, 905 (4th Cir.1996)). We adopt this hybrid standard for purposes of our review in this case. In addition, we look to whether an individual possessed diplomatic immunity at the time of his or her arrest. *See Al–Hamdi,* 356 F.3d at 569; *United States v. Kuznetsov,* 442 F.Supp.2d 102, 105 (S.D.N.Y.2006).

As mentioned in the foregoing discussion, art. IV, section 11 of the United Nations Convention makes applicable various privileges and immunities to "Representatives of Members to the principal and subsidiary organs of the United Nations and to conferences convened by the United Nations" while "exercising their functions and during their journey to and from the place of meeting[,]" including providing that such persons possess, under subsection (a),

immunity from personal arrest or detention and from seizure of their personal baggage, and, in respect of words spoken or written and all acts done by them in their capacity as representatives, immunity from legal process of every kind.

Subsection (g) adds that such representatives shall enjoy

such other privileges, immunities and facilities not inconsistent with the foregoing *as diplomatic envoys enjoy,* except that they shall have no right to claim exemption from customs duties on goods imported (otherwise than as part of their personal baggage) or from excise duties or sales taxes.

(Emphasis added).

In all proceedings before the trial court, appellant relied on art. IV, section 11 in advancing his claim of diplomatic immunity. In this Court, however, appellant has referred to art. V, sections 17 through 21, and not to art. IV. Section 19 provides that, in addition to the immunities and privileges specified in Section 18,[13] the "Secretary–General and all Assistant Secretaries–General shall be accorded in respect of themselves, their spouses and minor children, *the privileges and immunities, exemptions and facilities accorded to diplomatic envoys, in accordance with international law.*" (Emphasis added). The evidence submitted by appellant indicates that the position of Executive Secretary of the UNCCD is accorded Assistant Secretary–General status.

---

13. That section provides, in pertinent part:

SECTION 18. Officials of the United Nations shall:

(a) be immune from legal process in respect of words spoken or written and all acts performed by them in their official capacity[.]

The privileges and immunities granted to diplomatic envoys are set forth by the Vienna Convention. *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE U.S. § 469 cmt. d (1987);[11] *Brzak v. UN*, 551 F.Supp.2d 313, 317 (S.D.N.Y.2008). "The Vienna Convention provides diplomats with absolute immunity from criminal prosecution and protection from most civil and administrative actions brought in the 'receiving State,' *i.e.*, the state where they are stationed." *Tabion v. Mufti*, 73 F.3d 535, 537 (4th Cir.1996). Art. 29 of the Vienna Convention provides:

> The person of a diplomatic agent shall be inviolable. He [or she] shall not be liable to any form of arrest or detention. The receiving State shall treat him [or her] with due respect and shall take all appropriate steps to prevent any attack on his [or her] person, freedom or dignity.

Art. 31.1 provides, in pertinent part, that "[a] diplomatic agency shall enjoy immunity from the criminal jurisdiction of the receiving State."

Additionally, art. 37.1 provides:

> The members of the family of a diplomatic agent forming part of his [or her] household shall, if they are not nationals of the receiving State, enjoy the privileges and immunities specified in Articles 29 to 36.

The United States Diplomatic Relations Act made the provisions of the Vienna Convention applicable to the United

---

**14.** Comment d provides:

d. *Additional immunities for senior officials.* Under the two general conventions on privileges and immunities of international organizations, the Secretary–General and the assistant secretaries-general of the United Nations and of the Specialized Agencies are entitled to diplomatic immunities for themselves and their families. Although the United Nations Convention providing for such diplomatic privileges came into effect before the Vienna Convention on Diplomatic Relations, the diplomatic privileges and immunities enjoyed by senior international officials are those now codified in the Vienna Convention. See § 464. In the United States, such full diplomatic privileges are enjoyed by senior officials of the United Nations, but since the United States has not adhered to the Specialized Agencies Convention, senior officials of Specialized Agencies enjoy only the immunities described in this section.

States. *Al–Hamdi,* 356 F.3d at 569; *Tabion,* 73 F.3d at 536 n. 1. That Act provides:

> Any action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations, under section 3(b) or 4 of this Act [22 USCS §§ 254b or 254c], *or under any other laws extending diplomatic privileges and immunities,* shall be dismissed. Such immunity may be established upon motion or suggestion by or on behalf of the individual, or as otherwise permitted by law or applicable rules of procedure.

22 U.S.C.S. § 254d (2000) (emphasis added). *See also Brzak,* 551 F.Supp.2d at 317.

As the foregoing discussion demonstrates, appellant argued that his father was entitled to diplomatic status because he would travel to the United States on official business related to his post as the Executive Secretary of the UNCCD. In support of this argument, appellant referred to art. IV, section 11 of the United Nations Convention and argued that this immunity broadly applied to a representative's official period of stay in the country.[15] Appellant's own submission to the trial court, in the form of attestations by Frank Meek,

---

**15.** Art. V, section 19 of the United Nations Convention, which entitles Assistant Secretaries–General, and their spouses and minor children, to the privileges and immunities accorded to diplomatic envoys under international law, was never argued by appellant to the trial court, although passages are reproduced in the pertinent provisions section of appellant's brief to this Court. That section of the United Nations Convention does not expressly provide that diplomatic immunity attaches to Assistant Secretaries–General *only when* they are in a particular country on official business or exercising their official duties. Similarly, we are aware of no cases construing that section as such. Rather, in cases involving suits against Assistant Secretaries–General or other United Nations high officials, federal courts have generally proceeded from the analytical standpoint that those with Assistant–Secretary General status and other high officials named in art. V, section 19 of the United Nations Convention are entitled to complete diplomatic immunity under Article 31 of the Vienna Convention, without mentioning whether that official was in the United States at a particular time. *See Brzak,* 551 F.Supp.2d at 318–19; *De Luca v. United Nations Org.,*

Chief of Administration and Finance for the UNCCD, represented that, after 2001, the Elder Diallo enjoyed diplomatic status *when on official travel to the United States.*

■ Appellant was arrested on October 31, 2006. Although appellant's father possessed a general G–4 visa to enter the United States from April 20, 2006 to April 18, 2007, appellant presented no evidence to the trial court that would establish that appellant's father was actually on official travel to the United States at the time of his arrest. We disagree with any implied ruling by the trial court that the Elder Diallo's travel to the United States would no longer be "official" once the United States ratified the UNCCD, for the obvious reason that, as the former Executive Secretary of the Permanent Secretariat of the UNCCD, the Elder Diallo may have been required to travel to United Nations Headquarters to carry out his general responsibilities, notwithstanding this country's ratification of the UNCCD. Nonetheless, we hold that the trial court properly ruled that appellant had not sustained his burden of proving that he was entitled to diplomatic status on the date of his arrest. The failure to establish that the Elder Diallo enjoyed diplomatic immunity at the relevant point in time, when considered in conjunction with the State Department's certification that appellant lacked such immunity, formed a sufficient evidentiary basis for the trial court's legal conclusion that the motion to dismiss, on grounds of diplomatic immunity, was not meritorious. We affirm.

## D

### State Department Certification

We pause to address a point argued before the trial court, which involves the conclusive effect *vel non* of the State

841 F.Supp. 531, 534 (S.D.N.Y.1994), *aff'd without opinion,* 41 F.3d 1502 (2d Cir.1994). We have been presented with *no* substantive discussion of *any* section in the United Nations Convention. We thus focus on the arguments presented by appellant in this regard to the trial court, which were premised upon appellant's contention that the Elder Diallo, and thus, by extension, appellant, was entitled to diplomatic immunity in the United States while on official travel to this country.

Department's certification in this case. The State argued that this certification was conclusive as to appellant's diplomatic immunity and binding on the court. Appellant disagreed, but appears to concede this point in his appellate brief.

There is some ambiguity in the relevant case law as to the weight to be afforded such certifications under the circumstances presented in this case. On the one hand, in *Traore v. State*, 290 Md. 585, 589, 431 A.2d 96 (1981), a case involving an employee of the French Embassy and his claim of diplomatic immunity, the Court of Appeals explained:

> It is settled that the State Department's determinations concerning an individual's diplomatic status at a particular time should ordinarily be accepted by the courts. *In re Baiz*, 135 U.S. 403, 10 S.Ct. 854, 34 L.Ed. 222 (1890); *Haley v. State*, 200 Md. 72, 82–84, 88 A.2d 312 (1952). Thus, the State Department's determination that from June 16, 1976, to December 29, 1978, the defendant Traore's status entitled him to immunity from criminal and civil liability should be respected by the judiciary. *Similarly, if the State Department had made a contrary determination, that Mr. Traore was not entitled to immunity during the same period because of his diplomatic status during that period, such determination would ordinarily be deemed conclusive.*

(Emphasis added). The Court of Appeals further observed that a "principal reason underlying judicial deference to the executive branch of the federal government in certain matters involving foreign governments is the principle that courts should 'not so exercise their jurisdiction . . . as to embarrass the executive arm of the Government in conducting foreign relations.'" *Id.* at 591, 431 A.2d 96 (quoting *Ex parte Republic of Peru*, 318 U.S. 578, 588, 63 S.Ct. 793, 87 L.Ed. 1014 (1943)). *See also Al–Hamdi*, 356 F.3d at 572–73 (explaining that federal courts continue to find the State Department's certification conclusive on the matter of diplomatic immunity and holding that "the State Department's certification, which is based upon a reasonable interpretation of the Vienna Convention, is conclusive evidence as to the diplomatic status of an individual").

*Al–Hamdi, supra,* is instructive. In *Al–Hamdi,* the defendant, a citizen of the Republic of Yemen, contested his prosecution and conviction on firearm possession charges and argued that he possessed diplomatic immunity as a family member of a diplomat. 356 F.3d at 567. Al–Hamdi moved to the United States in 1993 when his father was appointed as an ambassador to the embassy of the Republic of Yemen in Washington D.C. *Id.* at 568. Al–Hamdi turned twenty-one in November 1998. His diplomatic identification card expired in December 1998. *Id.* Although the Yemeni embassy applied for a new identification card on his behalf in December 1999, no further information was provided when the State Department requested additional information. *Id.* Accordingly, Al–Hamdi was never issued a new diplomatic identification card. *Id.* Al–Hamdi was, however, issued A–1 visas on numerous occasions following the expiration of his diplomatic identification card. *Id.* at 568. As the United States Court of Appeals for the Fourth Circuit explains in *Al–Hamdi,* A–1 visas are given to non-immigrants who are, among others, career diplomatic officers and ambassadors, along with members of their immediate families. *Id.* at 568 n. 3 (citation omitted).

After his arrest, Al–Hamdi filed a motion to dismiss his indictment on grounds of diplomatic immunity. *Id.* at 568. In response to Al–Hamdi's motion to dismiss, the State Department certified that Al–Hamdi lost his diplomatic immunity on November 12, 1998, which was the date of his twenty-first birthday. *Id.* Thus, according to this certification, Al–Hamdi did not have diplomatic immunity at the time of his arrest. *Id.*

On appeal, Al–Hamdi challenged the denial of his motion to dismiss. *Id.* at 567–68. The Government conceded that the State Department's certification in this case was based upon its own interpretation of the Vienna Convention with respect to whether the "members of the family of a diplomatic agent forming part of his or her household," under Article 37.1, included children over the age of twenty-one. *Id.* at 569–70. Applying the "hybrid standard" discussed *supra,* the United States Court of Appeals for the Fourth Circuit first deter-

mined that the phrase "member of the family," for purposes of immunity under the Vienna Convention, could reasonably be construed as excluding children who reached the age of twenty-one years and those still in school at the age of twenty-three. *Id.* at 571. Most importantly, for purposes of our holding, the United States Court of Appeals for the Fourth Circuit ultimately concluded that, because the State Department's certification was based on a reasonable interpretation of the Vienna Convention, it constituted "conclusive evidence as to the diplomatic status of an individual." *Id.* at 573.

On the other hand, the opinion rendered in *U.S. ex rel. Casanova v. Fitzpatrick,* 214 F.Supp. 425 (S.D.N.Y.1963), by the U.S. District Court for the Southern District of New York, is also instructive. In that case, the District Court considered a petitioner's writ of habeas corpus advanced on the grounds that the court lacked jurisdiction over his person. *Id.* at 427. The petitioner, a Cuban national, contended that he was entitled to diplomatic immunity because he was appointed by the Cuban government as an attache and Resident Member of the Staff of the Permanent Mission of Cuba to the United Nations. *Id.* This case predated the United States ratification of the United Nations Convention in April 1970. Petitioner's diplomatic immunity argument was premised, in part, on Section 15(2) of the Headquarters Agreement of the United Nations. *Id.* at 428. The prosecution filed "an authenticated affidavit of the Chief Protocol Officer of the Department of State certifying that the Government of the United States has not agreed to grant diplomatic immunity to petitioner under section 15(2) of the Headquarters Agreement, 'and that he does not enjoy any diplomatic privileges and immunities under the aforesaid Article 15 of the Agreement.' " *Id.* at 432. The prosecution argued that this certification was conclusive and binding upon the court. *Id.*

The District Court rejected the government's argument as to the conclusive nature of the State Department certification in this case and observed:

Thus, a threshold question is presented. The precise issue before the Court is whether, in the light of section 15(2) of

the Headquarters Agreement, certification by the Department of State that an individual acknowledged to be a resident attache of the Permanent Cuban Mission to the United Nations has not been 'agreed upon' by the Government as entitled to diplomatic privileges and immunities thereunder, concludes the question.

A number of leading authorities do hold that the State Department certification is conclusive where the issue pertains to a diplomatic envoy accredited to the United States. This Court is of the view that such authorities do not control the question here presented. There is a sharp distinction between a diplomatic envoy accredited to the Government of the United States and a representative of a member state to the United Nations, an international organization. The status of each is different and immunity rests upon and is derived from entirely different desiderata.

Acceptance of a diplomatic envoy from a foreign government to the United States rests upon the exercise by our Executive of its power to conduct foreign affairs. It either accepts or rejects the diplomat in its sole and absolute discretion and, if he is received, he thereby is entitled, without more, under the Law of Nations, to full diplomatic immunity. These are political judgments by the Executive Branch of the Government and the Court is concluded thereby. In contrast, a representative of a member state to an international organization, such as the United Nations, is designated by his Government entirely independent of the views of other member states and indeed of the Organization. The United States has no say or veto power with respect to such representative of any member state. These representatives acquire immunity only to the extent that it is granted by legislation, or by agreement, whether under the basic charter, a general convention, or a separate agreement, as in the instant case by the Headquarters agreement. Accordingly, whether or not a particular individual is entitled to immunity is to be decided within the framework of the applicable document. The Headquarters Agreement simply provides that the three designated parties are to

agree upon those entitled to immunity. It contains no provision, nor is there any supplementary agreement, which defines how such agreement is to be manifested. The determination of a claim upon a disputed state of facts that one is entitled to immunity pursuant to that agreement is not a political judgment to be made by one of the parties thereto, but a judicial determination. The political decision in the first instance was made by the Government when it agreed that upon stipulated terms immunity was to take effect.

*Id.* at 432–33 (internal citations omitted).

The District Court ultimately concluded that the State Department had not, under the circumstances of this case, given its agreement that the petitioner be entitled to diplomatic immunity under the aforementioned agreement, pursuant to procedures established "to implement the required tri-partite consent under section 15(2)." *Id.* at 439, 440. The Court thus rejected petitioner's other arguments and held that it had jurisdiction over the petitioner under the indictment. *Id.* at 442.

According to the letter issued by Holly S.G. Coffey, Deputy Assistant Chief of Protocol for Diplomatic Affairs at the State Department, appellant was not entitled to diplomatic privileges and immunities in the United States because the "official records of the Department of State, including those of the United States Mission to the United Nations," established that appellant's father's was "notified by UN Secretariat to the United Nations in New York as a Special Representative of Secretary General ([UNCCD]) on August 2, 1990" and that appellant's father "served in that capacity until his assignment was terminated on June 22, 1993." Appellant's arrest occurred in 2006.

We need not definitively determine whether the State Department's certification in this case is entitled to conclusive weight. To be sure, the trial court credited the State Department's certification. However, even assuming that the certification erroneously omitted any reference to the current

United Nations position held by the Elder Diallo, and not-
withstanding the certification's broad conclusion that appel-
lant "is not entitled to diplomatic privileges and immunities in
the United States," the trial court nonetheless thoughtfully
considered appellant's argument as to his father's diplomatic
status and concluded that appellant did not succeed in prov-
ing that his father was in the United States, *in his official
capacity*, at the time of appellant's arrest. As we have
explained, the trial court did not err by ruling that appellant
failed to sustain his burden of proof on that issue.

## II

### Diplomatic Immunity—Motion to Suppress

We next address appellant's argument that the trial court
erred by denying his motion to suppress "because his seizure,
subsequent detention and statement to the police violated the
Vienna Convention on Diplomatic Relations and United Na-
tions Convention." Because we perceive no error in the trial
court's determination that appellant lacked diplomatic immuni-
ty at all relevant times, we affirm the trial court's denial of
appellant's motion to suppress. We explain.

### A

### Basis of Trial Court's Suppression Ruling

At the same December 14, 2007 hearing in which the trial
court issued its final ruling on appellant's motion to dismiss,
the trial court proceeded to consider additional arguments
relative to appellant's motion to suppress. During this seg-
ment of the hearing, appellant testified that he informed
Detective Geigel, subsequent to his arrest and on the way to
the stationhouse, that he was the son of a diplomat and would
like to contact his father or a member of the Burkina Faso
consulate. He further testified that, during the interrogation,
Detective Geigel informed him that officers had searched his
house, in an attempt to locate the gun used during the
incident, and found therein a passport containing a name other

than appellant's, to which appellant responded: "[I]t was not my passport and . . . my passport was from Burkina Faso and it was a diplomatic passport." According to appellant, Detective Geigel told him that he would have to wait until the next day before he could speak with someone from the consulate.

Detective Geigel's version of events differed from that offered by appellant. He conceded that he had never previously arrested anyone proclaiming diplomatic immunity but explained that he would "know what to do" if he arrested a diplomat. Detective Geigel testified that, under such circumstances, he would notify his supervisors, contact the consulate or embassy of the country involved and notify the State Department to verify the individual's claim of diplomatic immunity. Detective Geigel also conceded that he took no such action with respect to appellant. According to Detective Geigel's testimony, however, appellant never informed him of his purported diplomatic status.

Additionally, Detective Geigel was asked by appellant's counsel to read into the record the following excerpt from the State Department's Diplomatic and Consular Immunity publication:[16]

When a law enforcement officer is called to the scene of a criminal incident involving a person who claims diplomatic or consular immunity, the first step should be to verify the status of the suspect. Should the person be unable to produce satisfactory identification and the situation be one that would normally warrant arrest or detention, the officer should inform the individual that he or she will be detained until his or her identity can be confirmed.

The detective, however, was not asked to read into the record the following continuation of the above passage:

In all cases, including those in which the suspect provides a State Department—issued identity card, the law enforcement officer should verify the status with the U.S. Department of State or in the case of the United Nations communi-

---

16. This publication was admitted as an exhibit at the hearing.

ty, with the U.S. Mission to the United Nations. Once the status is verified, the officer should prepare his or her report, fully describing the details and circumstances of the incident in accordance with normal police procedures. If the suspect enjoys personal inviolability, he or she may not be handcuffed, except when that individual poses an immediate threat to safety, and may not be arrested or detained. Once all pertinent information is obtained, that person must be released.

DIPLOMATIC AND CONSULAR IMMUNITY at 16–17.

After hearing the testimony of the witnesses and the argument of counsel, the trial court denied appellant's motion to suppress. The court reiterated that appellant lacked diplomatic immunity at the time of his arrest.[17] The trial court further ruled:

Now, the detective was asked on cross-examination and shown a book that was titled Diplomatic and Consular Immunity. That was presented as well to the Court as I indicated during motions, I read all of those things. And the detective, while confessing to not having read that particular publication, did testify from the witness stand that he understands that there are certain procedures that police officers are trained in and, as a result of their training, they are to follow should someone claim that they are a diplomat or have diplomatic immunity. It is interesting to note that those procedures are, I won't say go overboard because that would be inaccurate, but are not directly what is contained in the manual that is described as I just mentioned, "Diplomatic and Consular Immunity, Guidance for Law Enforcement and Judicial Authorities." Having read this, I was able to harken back to my own training once upon a time and that is not factoring into the Court's decision, it is just I remember having gone through this, just because someone says they are a diplomat, the

---

**17.** As we shall explain, appellant also moved to suppress his statements to the police on the grounds of involuntariness. We address that argument in a later section of our opinion.

police have a procedure that they follow. *The fact of the matter is what they really are obliged to do is say prove it, and until you demonstrate to me that you are a diplomat, I don't have to do anything.* But in fact, what they do is they are more concerned about doing the right thing and do call the consular.

*There is no evidence that [appellant] produced any evidence, nothing whatsoever, even if you believe him that he was a diplomat. So even if he said it, and I don't believe he did, even if he said it, the detective would have been well within their legal right*—they might have been in trouble departmentally in terms of following departmental procedure, *but would have been within the legal right to saying okay, you say you are a diplomat, you have been issued an identification card that says that, show me. Failure to do that, they would treat them like any other individual.*

So with regard to the issue of diplomatic immunity, in regard to whether or not the statement is admissible, I find as a fact that [*appellant*] is not a diplomat, that at the time of the statement being taken he did not prove that he was a diplomat and merely stating it, if indeed he said it, was insufficient. Therefore, under that context, the statement is admissible.

(Emphasis added).

In sum, the trial court rejected the diplomatic immunity portion of appellant's motion to suppress on the following grounds: (1) appellant was not a diplomat entitled to the immunity he sought; (2) appellant never told the police that he was a diplomat; (3) even if he had informed the police at the time they took the statement, he should have, but failed to, produce any documentation verifying his status.

## B

### Parties' Contentions

Appellant argues that the trial court's ruling must be reversed because it was based on what appellant characterizes as a "wrong assumption: that a police officer would be 'well

within his legal right' to arrest or detain an individual until the individual demonstrates his right to the immunity." According to appellant, the "trial court's position is completely out of step with the requirement of the Vienna Convention on Diplomatic Relations . . . which requires receiving states to take a proactive approach to *prevent* arrest and detention of those persons entitled to assert the privileges and immunities of diplomatic status." Appellant adds:

As the Department of State makes clear in its direction, even where identifying documents are not readily available, the police are required to act to *prevent* arrest. The base assumption is not that they are "well within their legal right" to effect an arrest: to the contrary, the assumption police must make is—that *until the identity of the individual is verified*—the police are *not* within their legal right to *do anything*.

Appellant further asserts that the trial court, based on this "wrong-headed" assumption, erroneously discredited appellant's testimony at trial. Appellant then states:

[O]nce [appellant] informed Detective Geigel 1) that he was the son of a career United Nations diplomat and 2) that he held a stand-alone diplomatic passport issued by his native country, the Republic of Burkina Faso, the Detective was left with only one reasonable response: to release the [appellant] from custody immediately and return him to the hospital, with apologies, and/or to inform [appellant] that he may be detained from discharge from the hospital until the police verified his claim to diplomatic status with the proper United Nations and or Burkinabe Mission staff. In that scenario, there would have been 1) no handcuffs, 2) no custodial detention, 3) no interrogation and 4) no statement.

Joining appellant in this argument is *Amicus Curiae,* the Mission to the United States of the Republic of Burkina Faso (the Mission), which has filed an *amicus* brief in support of appellant's contentions.[18]

---

18. The Mission's core argument is that the Vienna Convention created an affirmative duty on the part of the State of Maryland, and the

The State counters that the trial court properly determined that appellant was not entitled to diplomatic status based on the evidence produced at the hearing. Specifically, the State cites to *Al–Hamdi*, 356 F.3d at 573, where the United States Court of Appeals for the Fourth Circuit gave conclusive weight to a State Department's certification as to an individual's diplomatic status. The State further argues that the United States Supreme Court decision in *Sanchez–Llamas v. Oregon*, 548 U.S. 331, 126 S.Ct. 2669, 165 L.Ed.2d 557 (2006), suggests that the Fourth Amendment exclusionary rule is not available to remedy a violation of the Vienna Convention.[19]

## C

### Standard of Review

Our review of the circuit court's denial of a motion to suppress is based on the record created at the suppression hearing and not the trial record. *Lewis v. State*, 398 Md. 349, 358, 920 A.2d 1080 (2007); *Whiting v. State*, 389 Md. 334, 345, 885 A.2d 785 (2005). We view all the evidence and any reasonable inferences drawn therefrom in the light most favorable to the prevailing party. *Id.*, *Whiting*, 389 Md. at 345,

---

Baltimore County Police, to not apprehend and question appellant until his claim of diplomatic immunity was verified. The Mission's brief is devoted principally to discussing the binding effect of the Vienna Convention on Maryland. The Mission also emphasizes that the Vienna Convention requires law enforcement officers to verify claims of diplomatic immunity before taking any action to either detain or arrest the party asserting immunity. Other aspects of the Mission's brief are discussed, *infra*.

19. *Sanchez–Llamas* addressed the exclusionary rule as it relates to Article 36 of the Vienna Convention on *Consular* Relations, Apr. 24, 1963, 21 U.S.T. 77, and not the Vienna Convention on Diplomatic Relations, codified at 23 U.S.T. 3227. The State, in its appellate brief, blurs the distinction between these two treaties. For example, the State erroneously asserts that the United States Court of Appeals for the Fourth Circuit's decision in *U.S. v. Al–Hamdi*, 356 F.3d 564 (4th Cir.2004), which we discuss *infra*, addressed the State Department's interpretation of a particular provision of the Vienna Convention on Consular Relations. To the contrary, the United States Court of Appeals for the Fourth Circuit discussed the Vienna Convention on *Diplomatic* Relations in *Al–Hamdi*. 356 F.3d at 567.

885 A.2d 785. We extend deference to the trial court's factual findings and review them only for clear error. *Whiting,* 389 Md. at 345, 885 A.2d 785; *State v. Rucker,* 374 Md. 199, 207, 821 A.2d 439 (2003) (citations omitted). On the other hand, " 'we review, independently the application of the law to those facts to determine if the evidence at issue was obtained in violation of the law and, accordingly, should be suppressed.' " *Lewis,* 398 Md. at 358, 920 A.2d 1080 (quoting *Whiting,* 389 Md. at 345, 885 A.2d 785).

## D

### Applicability of Fourth Amendment Exclusionary Rule

■ The Fourth Amendment to the United States Constitution prohibits unreasonable governmental searches and seizures. *Smith v. State,* 182 Md.App. 444, 461, 957 A.2d 1139 (2008) (citing *U.S. v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)). The exclusionary rule prevents the use of evidence obtained by the government in violation of the Fourth Amendment. *See Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (providing that the Fourth Amendment's exclusionary rule is applicable to state criminal prosecutions); *Brown v. State,* 364 Md. 37, 43–44, 770 A.2d 679 (2001)(Bell, C.J., dissenting). The State argues that, even if appellant had established his right to diplomatic immunity, the exclusion of his statement would be an inappropriate remedy. In support of this contention, the State relies on the Supreme Court's decision in *Sanchez–Llamas,* 548 U.S. at 337, 126 S.Ct. 2669, in which the Court rejected a petitioner's argument that a violation of Article 36 of the Vienna Convention on Consular Relations, which provides, in part, for the notification of consular offices at the request of a detained individual, required the suppression of his statements to the police.[20]

---

**20.** In *Sanchez–Llamas,* the Supreme Court addressed the cases of two foreign nationals who challenged their convictions on the grounds that neither had been advised of their rights under the Vienna Convention on Consular Relations. 548 U.S. at 338-41, 126 S.Ct. 2669. The

We need not decide the applicability of the *San-chez–Llamas* holding to the facts of this case because, even assuming that the exclusionary rule was available for those challenging a violation of their diplomatic immunity rights under the Vienna Convention on Diplomatic Relations, we conclude that the trial court's determination that appellant was *not*, in fact, entitled to diplomatic immunity was proper. Even if we were to hold otherwise, we observe that the trial court made an express finding that appellant's testimony was not credible and concluded that appellant, in fact, did not inform officers, at the time of his arrest, that he was the son of a diplomat. A trial court's resolution of evidentiary disputes and assessment of the credibility of the witnesses is entitled to great deference. *State v. Brooks*, 148 Md.App. 374, 398–400, 812 A.2d 342 (2002).[21] Because we affirm the denial of appel-

---

Supreme Court concluded that neither petitioner was entitled to the relief they sought on appeal and determined that it was, therefore, unnecessary to resolve the question of whether the Vienna Convention on Consular Relations created individual rights legally enforceable through the judiciary. *Id.* at 343, 126 S.Ct. 2669. As for Sanchez–Llamas, the Court proceeded to address his claim that his statements to police should be suppressed and held that neither the Vienna Convention on Consular Relations nor precedents applying the exclusionary rule supported the suppression of his statements to police. *Id.* at 349–50, 126 S.Ct. 2669.

21. In its brief, the Mission asserts that a "diplomatic passport is *prima facie* evidence of both allegiance to the country issuing the credential as well as entitlement to the diplomatic station it signifies, along with the attendant privileges and immunities." The Mission acknowledges, however, that "[i]n the instant case, the fact that [appellant] personally holds a diplomatic passport issued by the Republic of Burkina Faso was not extensively litigated." We need not discuss this matter further in light of the trial court's finding that appellant never asserted his diplomatic status to the detective. To the extent that the Mission would have us consider this particular argument for purposes of our review of the trial court's denial of appellant's motion to dismiss, we note that neither the Mission nor appellant has argued that evidence of a diplomatic passport alone outweighs the determinations as to diplomatic status issued by the U.S. State Department. *See, generally, Al–Hamdi*, 356 F.3d at 573 (holding that possession of an A–1 visa, standing alone, cannot confer diplomatic immunity upon an individual). The opinion expressed by the U.S. District Court for the Southern District of New York in *Kuznetsov*, 442 F.Supp.2d at 106, is instructive:

Although the Russian Mission has stated that Defendant performed duties on behalf of the Russian Federation in the United States at the

lant's motion to suppress on these grounds, we decline to address whether the trial court erroneously placed the burden on appellant to prove his diplomatic credentials at the time of his arrest.

## III

### *Brady* Violation

Appellant next argues that the State of Maryland "flouted its discovery obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), because impeaching information favorable to the accused was suppressed by the United States Government, conduct which is imputed to the State of Maryland by its exclusive reliance upon the Department of State." In support of this argument, appellant transcribed and submitted to the court various telephone messages that appellant's counsel contends he received from certain representatives of the Department of State and the United States Mission to the United Nations in New York. Appellant has submitted nothing to this Court to independently verify these transcriptions.[22] Nonetheless, in order to frame appellant's argument and articulate the basis for our opinion, we shall set forth appellant's factual allegations on this point.

### A

In the "*Brady* section" of appellant's brief, appellant alleges that the State Department certification, discussed *supra,* upon which the State has primarily relied in arguing that appellant lacks diplomatic immunity, contained incorrect information.

---

time of his arrest ..., diplomatic immunity is premised upon recognition by the receiving State, so that no person or government may "unilaterally assert diplomatic immunity." *United States v. Lumumba,* 741 F.2d 12, 15 (2d Cir.1984). "[R]ecognition by the executive branch is essential to establishing diplomatic status." *Id.* (citing RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 461 Commentary at 30).

**22.** Appellant has not submitted an affidavit with his appellate brief attesting to the veracity of these particular factual allegations.

Appellant further asserts that, upon receiving this certification from the State during pre-trial proceedings, appellant's counsel began to contact various offices at the State Department and "other agencies within the United States Government to procure a correction" in the State Department's records as to the Elder Diallo's status. The basis for this correction, according to appellant, is a document that appellant has identified as the "United Nations' Assistant Secretary General (ASG) List," which we shall hereafter refer to as the "U.N. ASG List." Appellant neither attaches the United Nations ASG List to the appendix to his appellate brief nor indicates where in the record we might locate a copy of this document. Nonetheless, we discern that appellant is referring to the document entitled "Senior Officials of the United Nations and Officers of Equivalent Rank Whose Duty Station is New York," which is dated June 14, 2006 and identifies the Elder Diallo as the Executive Secretary of the Permanent Secretariat of the UNCCD at that time.[23]

Appellant contends that, prior to trial, he directed a copy of the United Nations ASG List to Deputy Assistant Chief Coffey and further asserts that, on November 30, 2007, Deputy Assistant Chief Coffey recorded the following message on appellant's counsel's voice mail:

> Hi [appellant's counsel], this is Holly Coffey from the State Department's Office of Protocol. Um—I thought—I don't know what you're talking about as far as [the Elder Diallo's] position, and I can't even find him in the documents that you sent. But, uh, in our database, he was terminated, and has been terminated for quite a while, so our database controls. And, I don't know what this is or where you're pointing to, so if you can give me a call, I'll be here tomorrow. . . .

---

**23.** As we have explained, this document was included in appellant's "Second Motion to Alter and Amend, or Alternatively, to Reconsider and Vacate Order Denying [Appellant's] Motion to Dismiss," filed on November 27, 2007.

Appellant's counsel was apparently "convinced" by this message that Deputy Assistant Chief Coffey was unfamiliar with the United Nations ASG list and "not the proper source for inquiry" with regard to correcting the purported error in the State Department certification. Appellant's counsel "accordingly abandoned any further calls to her" and "redirected efforts" to an individual identified by appellant as "Caroline Wilson in the Legal Department of the United States Mission to the United Nations in New York." According to appellant, on December 10, 2007, appellant's counsel received the following telephone message:

Hello, I'm Russell Graham, of the United States Mission to the United Nations in New York. I understand you called Caroline Wilson of this Office. I'm returning your call. If you're representing a Mr. Diallo, as part of the U.N. diplomatic community, and need a certification of his diplomatic status, what I'd like you to do is call my colleague, Mary Ambrose –A–M–B–R–O–S–E–at [telephone number deleted]. She does certifications. She is not in the office today but will be in the office tomorrow. If you call her tomorrow you can explain what you'd like precisely and why. She will probably ask you to send her a letter that she can react to, and then she can take care of it, and it can all be done [sic] fax.

Appellant's counsel subsequently contacted Ambrose on December 11, 2007 by telephone and was instructed to direct a letter to her containing his inquiry. In accordance with that directive, appellant's counsel faxed a letter, along with a copy of the United Nations ASG List, to Ambrose. Appellant adds that, on December 12, 2007, his counsel received the following telephone message:

Hi, [appellant's counsel], it's Mary Ambrose. It's about five minutes after three on Wednesday [December 12, 2007]. I did get your fax and I recognized it actually as something that I routinely get from the Legal Office of the United Nations. And, Mr. Diallo's name appears on page twenty-seven (27) I think it is, yes page twenty-seven,—um and the away-from-New-York-Headquarters people—uh—begins on

page twenty-five (25), so Mr. Diallo falls within that group of people who are posted abroad. Again, the away from New York Headquarters list begins on page twenty-five, Mr. Diallo's name is on page twenty-seven (27). And that all concludes on about page thirty-three (33). Having said that, *there is a possibility that Mr. Hama Diallo enjoyed or enjoys diplomatic privileges and immunities, when he is in the United States.*

(Emphasis added).

According to appellant, his counsel subsequently wrote to Ambrose on December 14, 2007, "making her aware of the conflict in the information [and] expressing his concern that a breach of international diplomatic protocol may have occurred." Appellant's conclusion as to the existence of a "conflict in the information" appears to be rooted in Ambrose's purported statement that "there is a possibility that Mr. Hama Diallo enjoyed or enjoys diplomatic privileges and immunities, when he is in the United States," a statement which appellant characterizes as contradicting the conclusions of the State Department with respect to the Elder Diallo's diplomatic status in the United States. Appellant explains that, upon raising this concern with Ambrose, "all communication channels between [appellant's counsel] and the Department of State immediately closed," and "[p]hone calls went unreturned and correspondence unanswered." Appellant further asserts that "letters between the Burkinabe Embassy and the Department of State were exchanged," but that "[t]hese letters [were] also met with no response."

Finally, in his reply brief, appellant quotes from what he characterizes as a February 6, 2009 letter from Russell F. Graham, Minister Counselor, Host Country Affairs, U.S. Mission to United Nations, which was sent, according to appellant, in response to a February 2, 2009 letter sent by appellant's counsel to the Honorable Susan E. Rice, Permanent Representative to the United Nations. According to appellant, this inquiry was issued by appellant after the election of President Barack Obama, whose administration, in appellant's words, "signaled a policy of far greater transparency than was the

rule in the previous Administration under President George W. Bush."

Appellant contends that this February 6, 2009 letter from Russell F. Graham read, in pertinent part:

I am responding to your request, dated February 2, 2009, to Ambassador Susan Rice, United States Representative to the United Nations, for clarification of the diplomatic status of Mr. Hama Arba Diallo specifically, in September 2007.

According to an annual report dated May 31, 2007, entitled, Senior Officials of the United Nations and Officers of Equivalent Rank, provided by the United Nations to the United States Mission to the United Nations, the name of Mr. Hama Arba Diallo appears as an Assistant Secretary General with a duty station of Bonn, Germany.

On the date you indicate in your query, September 7, 2007, Mr. Hama Arba Diallo would have been entitled to diplomatic privileges and immunities when present in the United States.... Appellant does not attach a copy of this letter for our review. Rather, he notes that the letter is "on file with [appellant's] counsel".

Based on this purported letter, appellant asserts that the "Department of State has conceded—more than a year after trial—that its certification is factually erroneous."

**B**

Appellant, relying on these factual allegations to support his *Brady* argument, contends that information related to the diplomatic status of his father remained within the exclusive control of the United States Government and suggests that the State Department suppressed evidence that would have led to a revision of its initial certification. Appellant adds: "[B]ecause the State of Maryland solicited and relied exclusively upon the Department of State for the certification introduced at trial, as well as for its factual accuracy, suppression of impeaching information should be imputed to the prosecutor." Appellant further asserts:

The Government's conduct in this case suggests that the State Department made an error in certifying an incorrect fact to the trial court, which it then sought to either cover up or minimize, and that the error may have been a matter of incompetence, initially. Once the conflict in the information was discovered, however, the State of Maryland, by way of the United States Government, *had a duty to disclose the correct information and revise its certification.*

(Emphasis added). Appellant emphasizes that the "suppressed information regarding [his father's] entitlement to diplomatic privileges and immunities" would have been favorable to appellant because it would have substantiated his claim to immunity and impeached the credibility of the State Department's certification. Furthermore, according to appellant, such "suppressed information" was material to the court's ruling.

The State first counters that appellant's *Brady* argument is unpreserved because it was not addressed to the trial court. *See* Md. Rule 8–131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court. . . ."). Indeed, despite the fact that appellant appears to have been alerted, by December 14, 2007, to what he describes as the "diametrically" opposed positions of the Department of State and the Legal Department of the U.S. Mission to the United Nations in New York, appellant's motion for new trial, filed on December 24, 2007 and argued on February 8, 2008, did not specifically assert *Brady* violations on the part of the State. Rather, appellant argued that it had "recently discovered evidence" requiring the court to exercise its revisory power over the judgment and grant a new trial, pursuant to Maryland Rule 4–331(b).[24] Appellant added that

---

**24.** Appellant, by way of footnote, argues:

In view of the fact that the trial court shifted the State's discovery burden to [appellant], expecting [appellant] to actually subpoena officials of the United States Government to divulge the impeaching information on the witness stand, rather than insisting that the State

he would "present evidence from the United States Department of State that will directly controvert the State's evidence from the same agency . . . . "

Appellant argues to this Court that he thus did allege to the trial court that the "Government possessed contradictory information about the document it had not turned over prior to trial." We are satisfied that appellant's *Brady* argument is sufficiently preserved. Nonetheless, it entitles appellant to no relief. After reviewing the substance of this argument, we conclude that it is without merit. We explain.

## C

 In *Brady v. Maryland,* 373 U.S. at 87, 83 S.Ct. 1194, the U.S. Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *See also State v. Williams,* 392 Md. 194, 198, 896 A.2d 973 (2006). The scope of the requirement to disclose under *Brady* includes both exculpatory evidence and impeachment evidence. *Williams,* 392 Md. at 198, 896 A.2d 973 (citing *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) and *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). It is well settled that the prosecution's duty to disclose is mandatory and must be complied with, even in the absence of a request for such evidence by the accused. *Id.* (citing *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). *See also Wilson v. State,* 363 Md. 333, 345–46, 768 A.2d 675 (2001); *Adams v. State,* 165 Md.App. 352, 358–62, 885 A.2d 833 (2005).

---

procure and turn over the impeaching information, its refusal to grant a continuance on February 8, 2008 of [appellant's] Motion for New Trial also seems an abuse.

Appellant has not properly raised the denial of his motion for new trial as an issue for this Court's consideration. Thus, we decline to address the propriety of the trial court's rulings with respect to that motion.

■ The Court of Appeals recently reiterated the criteria necessary to establish that a *Brady* violation occurred:

> As we pointed out in *Grandison v. State*, 390 Md. 412, 431, 889 A.2d 366, (2006 [2005]), citing *Conyers v. State*, 367 Md. 571, 597–98, 790 A.2d 15, 30–31 (2002), in order to establish a *Brady* violation, the petitioner must show that (1) the prosecutor suppressed or withheld evidence that would have been favorable to the defense because it (i) was exculpatory, (ii) provided a basis for mitigation of sentence, or (iii) provided a basis for impeaching a State witness, and (2) the suppressed evidence was material.

*Harris v. State*, 407 Md. 503, 521, 966 A.2d 925 (2009). Applying these criteria to appellant's argument, we conclude that appellant's argument is fundamentally flawed. The core premise of a *Brady* violation is the suppression or withholding of evidence. Appellant has failed to demonstrate how the State of Maryland is responsible for the suppression or withholding of evidence related to the diplomatic status of his father.

■ "Evidence will be deemed to be suppressed within the meaning of *Brady* if it is ' "information which had been known to the prosecution but unknown to the defense." ' " *Conyers v. State*, 367 Md. 571, 601, 790 A.2d 15 (2002) (quoting *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 557 (4th Cir. 1999)) (in turn quoting *U.S. v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). On the other hand, "[t]he prosecution cannot be said to have suppressed evidence for *Brady* purposes when the information allegedly suppressed was available to the defendant through reasonable and diligent investigation." *Ware v. State*, 348 Md. 19, 39, 702 A.2d 699 (1997). Stated alternatively, "*Brady* offers a defendant no relief when the defendant knew or should have known facts permitting him or her to take advantage of the evidence in question or when a reasonable defendant would have found the evidence." *Id.* Therefore, "[i]f the defendant learns of the information before the conclusion of the trial, to wit, in time to use it, there has been no *Brady* suppression." *Adams*, 165 Md.App. at 421–22, 885 A.2d 833.

Appellant argues that the State Department erred in certifying that appellant was not entitled to diplomatic immunity and that it attempted to cover up or minimize this error once appellant became aware of what it characterizes as conflicting information on the part of the Legal Department to the United States Mission to the United Nations. Appellant's argument fails from the outset because the information upon which appellant bases this argument, *i.e.,* (1) the United Nations ASG List and (2) the telephone messages purportedly received from various government officials, were known to appellant by December 14, 2007, the date of trial. Additionally, the United Nations ASG List, along with other documents supporting appellant's argument that his father was an Assistant Secretary–General at the time of his arrest, were submitted by appellant for the trial court's consideration. Because these facts were known to appellant, they do not come within the duty to disclose imposed by *Brady*.

Appellant, in essence, faults the State for failing to affirmatively correct what appellant believes to be an erroneous certification issued by the State Department. That appellant believes the State Department erred in its certification does not mean that either the State Department or the State of Maryland suppressed evidence in appellant's case. Nothing in the telephone messages transcribed by appellant supports appellant's speculation that the federal government and the State deliberately or carelessly withheld information related to the diplomatic status of appellant's father.[25] The information at trial and on appeal, upon which appellant attacks the credibility of the State Department certification, was information known to appellant and/or used by appellant in support of his various pre-trial motions. There can be no *Brady* violation

---

**25.** Appellant concedes, in a footnote in his appellate brief, that the United States Government has made "no definitive statement regarding Hama Arba Diallo's diplomatic status during the course of these proceedings, other than indicating it was *possible* he had diplomatic status, raising the specter it had information it refused to divulge."

where there is no suppression of evidence. Accordingly, we resolve this issue against appellant.[26]

## D

Notwithstanding our holding, we shall summarily dispose of appellant's argument that, because the State "solicited and relied exclusively upon the Department of State for the certification introduced at trial, as well as for its factual accuracy, suppression of impeaching information should be imputed to the prosecutor." Appellant cites to Supreme Court and Maryland cases establishing that facts known to prosecutors in the same office or to police involved in the investigation will be imputed to the State for purposes of *Brady. See, e.g., Kyles v. Whitley,* 514 U.S. 419, 437–38, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *see also Williams,* 392 Md. at 223, 896 A.2d 973. Appellant also cites to a decision of the Massachusetts Supreme Judicial Court in *Commonwealth v. Lykus,* 451 Mass. 310, 885 N.E.2d 769, 782 (2008), where the *Lykus* Court observed that,

in dual sovereign situations, where a "motion [for specific exculpatory evidence] is allowed . . . cooperation between State and Federal prosecutors is and should be common enough so that the burden of securing Federal cooperation should be placed on the State prosecutor rather than on the defendant." *Commonwealth v. Liebman,* 379 Mass. 671, 675, 400 N.E.2d 842 (1980), *S.C.,* 388 Mass. 483, 446 N.E.2d 714 (1983).

The prosecution has a duty to learn of and disclose favorable information "known to the others acting on the government's behalf in the case. . . ." *Kyles,* 514 U.S. at 437, 115 S.Ct. 1555; *see also Williams,* 392 Md. at 211, 896 A.2d

---

**26.** Because we have held that there is no evidence of suppression in this case, we will not address the State's argument that, even if additional information was not disclosed to appellant, "there is no indication that such information would impact [appellant's] situation as an adult over the age of 23 and not living in his father's household." In any event, the State has provided no authority supporting this statement.

973. For that reason, a state prosecutor's duty of disclosure extends to evidence within the knowledge of a state police officer involved in the investigation of the case. *Kyles*, 514 U.S. at 437–38, 115 S.Ct. 1555. In addition, a prosecutor has a duty to disclose exculpatory and impeaching information possessed by other agents of the government forming part of the "prosecution team." *See United States v. Reyeros*, 537 F.3d 270, 281 (3d Cir.2008) (citing *United States v. Pelullo*, 399 F.3d 197, 216–18 (3d Cir.2005)); *United States v. Locascio*, 6 F.3d 924, 949–50 (2d Cir.1993); *United States v. Antone*, 603 F.2d 566, 569 (5th Cir.1979); *see also Williams*, 392 Md. at 219, 896 A.2d 973 (observing that "this concept of the 'prosecution team' supports this Court's belief that prosecutors within the same office are not excused from their *Brady* obligations.")

The critical inquiry, therefore, in determining imputability between different offices or branches of the government, focuses on whether a government agent acts on behalf of the State of Maryland or forms part of the same "prosecution team," by virtue of involvement in the investigation of the case or employment by the prosecutor's office. In this regard, *Lykus, supra,* upon which appellant relies, is distinguishable from the facts of this case. In *Lykus,* the Supreme Judicial Court of Massachusetts held:

> Without defining the scope of the issue, the circumstances of this case fall well within the core of the principle under which the actions of one sovereign may be imputed to another. This is not a case in which the FBI had little or no involvement. This was, at the very least, a joint investigation by Federal and State authorities. No less than nineteen FBI agents testified before the jury at the defendant's trial, and others were involved in the investigation. The heft of the Commonwealth's case was provided by the FBI, and if ever an FBI failure to disclose exculpatory evidence should be imputed to the Commonwealth, this is that case.

885 N.E.2d at 782–83.

In *Commonwealth v. Clemente*, 452 Mass. 295, 893 N.E.2d 19, 35–36 (2008), the Supreme Judicial Court of Massachusetts

distinguished *Lykus*. It rejected the defendants' argument that suppression pursuant to *Brady* should be imputed to the prosecution, where the defendants failed to allege or prove that various agents of the State police or the United States Department of Justice Drug Enforcement Agency, which the defendants claimed retained evidence favorable to the defense, were involved in any way in the investigation of the crimes for which the defendants were charged.

The *Clemente* Court explained that the prosecutor's duty to disclose extended "only to 'information in the possession of the prosecutor and information in the possession of persons "sufficiently subject to the prosecutor's control." ' " *Id.* at 35 (quoting *Commonwealth v. Beal*, 429 Mass. 530, 709 N.E.2d 413, 416 (1999) (citation omitted)). The *Clemente* Court further explained: "Those subject to the prosecutor's control and whose work product is included within the prosecutor's duty of disclosure are those persons acting, in some capacity, as agents of the government in the investigation and prosecution of the case." *Id.* (citing *Beal, supra.*). The *Clemente* Court ultimately observed that "the material sought was not prepared by anyone within the control of the prosecution and there was no obligation on the part of the prosecutor to obtain or disclose the report argument." *Id.* at 36. *See also United States v. Merlino,* 349 F.3d 144, 154 (3d Cir.2003) (explaining that there is no " 'duty on the prosecutor's office to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue' ") (quoting *United States v. Morris,* 80 F.3d 1151, 1169 (7th Cir.1996)) (cited by *Reyeros,* 537 F.3d at 285).

In *Reyeros,* 537 F.3d at 281–82, the Third Circuit set forth three questions relevant to the analysis, to be undertaken on a case-by-case basis, as to whether a federal prosecutor could be deemed to have "cross-jurisdiction constructive knowledge" of information known to state actors, such that the information fell within the scope of the federal prosecutor's duty to disclose:

[In *United States v. Risha,* 445 F.3d 298 (3d Cir.2006)], [w]e held that a case-by-case analysis was appropriate when

considering a federal prosecutor's constructive knowledge, and we set forth three questions as relevant to the analysis: "(1) whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control'; (2) the extent to which state and federal governments are part of a 'team,' are participating in a 'joint investigation' or are sharing resources; and (3) whether the entity charged with constructive possession has 'ready access' to the evidence." *Id.* at 304. The first question concerns the "intermingling" of the forces of the federal government with the forces of the state sovereign. *Id.* The second question is closely related to the first and asks whether the federal government and the state "are part of a team or are engaged in a joint effort" or whether they had a "close working relationship." *Id.* at 305. The last question considers whether the information the defense alleges should have been disclosed was available to the prosecution if it had sought to discover it. *Id.* In *Risha*, we opined that facts indicating that a state agent was heavily involved in the prosecution and knew of impeachment evidence would support a conclusion that federal prosecutors had constructive knowledge of that evidence. *Id.* at 306.

These factors are helpful in our determination of whether knowledge which appellant alleges was available to the U.S. State Department could theoretically be deemed to be within the constructive possession of the State of Maryland. There is no indication that the State Department, in issuing what appears to be a routine certification of an individual's diplomatic status, was acting on behalf of the State of Maryland or under the control of the State. Nor can it be said that the State Department participated in a joint investigation of the offenses in this case or that the evidence that appellant alleges was suppressed would have been readily accessible to the State of Maryland. *See also Pelullo,* 399 F.3d at 218 (holding that information known to officials in the Pension and Welfare Benefits Administration of the United States Department of Labor was not within the constructive knowledge of federal prosecutors because nothing indicated that the Department of

Labor officials and the prosecution formed part of the same "prosecution team" or jointly participated in the investigation or that the prosecution had any control over Department of Labor officials) (cited in *Reyeros*, 537 F.3d at 284–85); *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir.1998) ("[T]he imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt a 'monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.' ") (citation omitted) (cited in *Pelullo*, 399 F.3d at 217).

Thus, based on the foregoing discussion, while we hold that there is not a scintilla of evidence of suppression in this case, we further conclude that even if the U.S. State Department had knowledge concerning the Elder Diallo's diplomatic status that was not disclosed in its certification, we would not impute knowledge of that information to the State of Maryland.

### E

 Before we conclude our analysis of this matter, we shall address the February 6, 2009 letter referred to by appellant in his reply brief. There are multiple reasons why we cannot accord substantive consideration to this purported letter.

As an initial matter, we observe that this letter was dated February 6, 2009. Appellant's first brief submitted to this Court was filed on March 6, 2009. The letter, however, was only brought to our attention in appellant's reply brief, which was filed on April 28, 2009.[27] As justification for this delay in

---

27. Appellant's reply brief was originally due on April 20, 2009. On April 28, 2009, appellant filed an "Unopposed Motion to File Appellant's Reply Brief Out of Time and to Extend the Time for Oral Argument." In that motion, appellant argued that appellant's counsel "has had repetitive occurrences of posterior vitreous detachment in his right eye in the period from February, 2009 through early April, 2009, and remains at fairly high risk of retinal detachment, necessitating frequent full-dilation ocular examinations[.]" Appellant stated that we previously granted appellant's request to file his initial brief out of time

bringing what is clearly a critical and material argument to our attention, appellant explains that the February 6, 2009 letter was only received by appellant's counsel on March 6, 2009; counsel explains:

Counsel has suffered multiple posterior vitreous detachments in his right eye over the course of the months of February, March and April, and has been at heightened risk for retinal detachment, requiring him to undergo regular, full-dilation ocular examinations. As such, there have been occasional disruptions with his access to driving, concentrated reading and writing, retrieval of mail, etc.

Even were we to credit appellant's explanation and excuse the one month period between when the letter was issued and when counsel "received" it, and even were we to excuse appellant from failing to mention this letter in his March 6, 2009 submission to this Court, we note that appellant sat on this letter for an additional one month and twenty-two days before bringing the existence of this letter to the attention of this Court or the State. Notwithstanding that counsel attributes his lack of diligence to his health problems, we further note that co-counsel has joined with counsel in the submission of both the initial brief and reply brief to this Court. Although co-counsel appeared for the scheduled oral argument in this Court, no explanation is provided as to why co-counsel has not previously assisted in these proceedings.

■■■ Despite this Court's Order, permitting submission of a reply brief, we are not inclined to accord any consideration to this purported letter, because appellant's counsel has failed to provide this Court or the State with a copy of said letter. Neither the authenticity of the letter nor its substance is subject to verification. Appellant does not represent that he has quoted the letter in its entirety; he has chosen, instead, to reproduce "pertinent" parts. Taken out of context, there may

in early March, based on a "schedule conflict occurring with an eye examination while the [appellate brief] was in production[.]" We accepted appellant's reply brief, though untimely filed, but denied appellant's request to postpone oral argument.

well be matters in juxtaposition to the "pertinent parts" contained therein or which provide clarification as to the said "pertinent parts." We ordinarily decline to consider arguments raised for the first time in a reply brief. *See Gazunis v. Foster*, 400 Md. 541, 554, 929 A.2d 531 (2007); *Strauss v. Strauss*, 101 Md.App. 490, 509 n. 4, 647 A.2d 818 (1994). This rule is guided, in part, by fundamental principles of fairness to the opposing party.

Finally, as discussed *supra*, the relevant inquiry is whether the individual possessed diplomatic immunity *at the time of his or her arrest. See Al–Hamdi*, 356 F.3d at 569; *Kuznetsov*, 442 F.Supp.2d at 105. Appellant was arrested on October 31, 2006. The portion of the purported letter quoted by appellant addresses appellant's diplomatic immunity as of September 7, 2007.[28]

For all of these reasons, appellant's reference to the February 6, 2009 letter is not factored in our analysis.

## IV

### Voluntariness of Confession—Motion to Suppress

As an alternative to his argument that his statements to the police should be suppressed on the grounds that they were obtained in violation of his diplomatic immunity, appellant sought to suppress these statements on the grounds that they were involuntary under a totality of the circumstances.

At the suppression hearing, appellant testified that he was discharged from Johns Hopkins Hospital during the evening of October 31, 2006, where he had been admitted and treated for a gunshot wound to this chest. Appellant testified that, during his treatment that day, he was given medication to alleviate pain and was connected to an intravenous tube that administered morphine. Additionally, appellant further testi-

---

**28.** Appellant explains that this letter erroneously referred to September 7, 2007 instead of September 20, 2007, the date of the State Department's certification.

fied that a chest tube was connected to his lung, which was deflated as a result of the gunshot wound.

According to appellant, after his discharge, he ran into Detective Geigel in the hallway of the hospital. Detective Geigel handcuffed appellant and transported him to the stationhouse. Appellant testified that he remained in an open and "extremely cold" hallway, handcuffed and in leg irons, for three to four hours between the time he was processed and when he finally spoke with an officer. Appellant maintained that he was "kind of light headed and a little bit drowsy" as a result of his medication and was in pain from the gunshot wound, but stated on cross-examination that he was not hallucinating. Appellant was ultimately advised of his *Miranda* rights, signed a *Miranda* rights waiver form and offered an oral and written confession, implicating himself in the events that led to his trial and conviction. During cross-examination, appellant stated that he had previously been arrested, and ultimately sentenced, in Harford County on a misdemeanor and did not tell the investigating officers that he was a diplomat at that time. He later added that he understood, in the instant case, that he was being arrested on a felony charge and that the seriousness of the charge prompted him to assert his diplomatic status.

Detective Geigel testified, and appellant conceded, that he did not ask appellant if he was in pain or on medication, but that appellant never volunteered such information to him. Detective Geigel did ask appellant if he could read and write English and observed that appellant could speak English. Detective Geigel emphasized that appellant, in signing the *Miranda* waiver form, acknowledged that he made the statement of his own free will and without any promises and inducements. According to Detective Geigel, his procedure in obtaining a waiver of *Miranda* rights involved explaining the suspect's rights to the suspect and ensuring understanding of those rights before proceeding. He further testified that he routinely waited outside of the interrogating room while a suspect issued a written statement, as opposed to standing and looking over the suspect's shoulders, which Detective

Geigel believed was "intimidating." Detective Geigel would then review the written statement and ask questions, allowing the suspect to write out the statement and initial next to the suspect's answers.

Appellant does not contest that he signed a *Miranda* rights waiver form and confessed to the police. Rather, appellant urges us to conclude that the police exploited appellant's condition in order to extract a confession. Specifically, appellant asserts that the police did not investigate his claim of diplomatic immunity, underscoring his physical condition at the time of the confession. Appellant, accordingly, assigns error to the following determination by the trial court that appellant's statement was voluntary:

> Even if the detective had asked [appellant] are you on any medication, and even if [appellant] had responded that he was on medication, that would not preclude the detective from taking a statement. He would have done what he did, and that is conduct further inquiry, common sense inquiry to see if that medication was adversely affecting [appellant's] ability to perform cognitively.

> And the Court finds as a matter of fact that based on the totality of the circumstances of the testimony, that [appellant] did understand what he was being asked, that he cognitively understood and even if he were under some sort of medication and we only have his word for it that he was, there is no indication that he did not understand the questioning being asked of him, nor the answers given.

> He suggests, and I think it is pointed out by the State, he suggests that he never even made any comment to the detective about being, quote unquote, in pain until after he gave the statement.

> Now, with regard to voluntariness, as well as the *Miranda* aspect of the statement, we are going to go back to what [appellant] said about being a diplomat or at least enjoying diplomatic immunity. [. . .] But he also indicates that he knows the difference between a felony and a misdemeanor and it is hard for this Court to understand, and I

will set aside for a moment the alleged inducements, set those aside for the moment, it is hard for the Court to understand that a person with this young man's obvious intelligence[,] as witnessed by him testifying[,] would have written a statement if he didn't want to knowing full well he enjoys diplomatic immunity, if he actually believed that.

So the Court is looking at the totality of circumstances which includes [appellant's] own testimony and I think that one of the things that is critical here is that [appellant], if believed, understands without question that he can exercise his right of diplomacy any time he wishes and did not have to agree to give a statement, did not waive his rights under *Miranda.* That deals with the diplomatic aspect of it.

With regard to allegations that this statement was induced by police,[29] not threats but promises that somehow providing a statement might be of benefit at a bail hearing and/or before the Court, the Court weighs the credibility of witnesses and finds as a matter of fact that I don't believe [appellant]. I don't believe [appellant] told the police he was a diplomat's son. I don't believe [appellant] asked to have—to speak with the consulate or his father because the detective testified had he asked for any of those things he would have stopped.

\* \* \*

I find as a fact that *Miranda* was complied with, that [appellant] was advised of his *Miranda* rights, and that he knowingly and voluntarily waived his rights and freely and voluntarily gave a statement to the police.

 In Maryland, a confession is inadmissible as evidence "unless it is 'shown to be free of any coercive barnacles that may have attached by improper means to prevent the

---

29. Although appellant includes one sentence on this topic in the section of his appellate brief setting forth a "summary" of his argument on appeal, appellant does not advance any substantive argument that his confession was involuntary in light of improper promises and inducements on the part of the police. Accordingly, we restrict our review to the grounds set forth by appellant, namely, whether appellant's statement was voluntary under a totality of the circumstances.

expression from being voluntary.'" *Gorge v. State,* 386 Md. 600, 621, 873 A.2d 1171 (2005) (quoting *Hillard v. State,* 286 Md. 145, 150, 406 A.2d 415 (1979)); *see also Knight v. State,* 381 Md. 517, 531–32, 850 A.2d 1179 (2004). To be voluntary, a confession must be "freely and voluntarily made," such that the defendant "knew and understood what he [or she] was saying" at the time of rendering the confession. *Knight,* 381 Md. at 531–32, 850 A.2d 1179 (quoting *Hoey v. State,* 311 Md. 473, 480–81, 536 A.2d 622 (1988)). Moreover, "[i]n order to be deemed voluntary, a confession must satisfy the mandates of the U.S. Constitution, the Maryland Constitution and Declaration of Rights, the United States Supreme Court's decision in *Miranda,* and Maryland non-constitutional law." *Gorge,* 386 Md. at 621, 873 A.2d 1171 (quoting *Knight,* 381 Md. at 531–32, 850 A.2d 1179); *Ball v. State,* 347 Md. 156, 173–74, 699 A.2d 1170 (1997). The State retains the burden of proving, by a preponderance of the evidence, that the confession was freely and voluntarily made. *Gorge,* 386 Md. at 621, 873 A.2d 1171 (citing *Winder v. State,* 362 Md. 275, 306, 765 A.2d 97 (2001)); *Lincoln v. State,* 164 Md.App. 170, 181, 882 A.2d 944 (2005).

▉▉▉ In assessing the voluntariness of a confession, we examine the totality of the circumstances surrounding the confession. *Gorge,* 386 Md. at 621, 873 A.2d 1171; *Knight,* 381 Md. at 533, 850 A.2d 1179. A non-exhaustive list of factors relevant to this determination include "'the manner in which [the interrogation] was conducted, the number of officers present, and the age, education, and experience of the defendant.'" *Knight,* 381 Md. at 533, 850 A.2d 1179 (quoting *Williams v. State,* 375 Md. 404, 429, 825 A.2d 1078 (2003)); *Winder,* 362 Md. at 306, 765 A.2d 97. As we noted *supra,* we limit our review of the trial court's denial of appellant's motion to suppress to the record at the suppression hearing. *Gorge,* 386 Md. at 621, 873 A.2d 1171; *Winder,* 362 Md. at 311, 765 A.2d 97.

Based upon our review of the record, we perceive no error in the trial court's determination that appellant's confession was voluntary under a totality of the circumstances. Although

appellant testified that he was on medication, the trial court found, based on the totality of the circumstances, that appellant was capable of understanding the questions being asked of him. The trial court disbelieved appellant's testimony and credited Detective Geigel's testimony, to the effect that appellant was coherent and responsive to questions posed by the detective. None of the testimony indicated that appellant was emotionally distraught or cognitively impaired. Although the fact that appellant had just been released from the hospital, where he testifies he was treated with morphine and other pain medication, was a relevant factor in the totality of the circumstances analysis, it was not dispositive. *See, e.g., Gorge,* 386 Md. at 621–22, 873 A.2d 1171 (affirming a trial court's determination that a statement was voluntary, under a totality of the circumstances, when, *inter alia,* the interrogating detective's uncontroverted testimony established that defendant was lucid and accurate at the time of interrogation, despite the fact that the interrogation took place in the defendant's hospital room "while he was recovering from serious injuries"); *see also Rowe v. State,* 41 Md.App. 641, 646, 398 A.2d 485 (1979) (holding that a confession was not inadmissible "merely because [a defendant] may have been susceptible to suggestion due to the influence of self-administered narcotics," although "it is a factor to consider")(citations omitted). We affirm.

**APPEAL FROM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY DENYING APPELLANT'S MOTION TO DISMISS IS DISMISSED. ALL OTHER JUDGMENTS ARE AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**